396 So.2d 23 (1981)
Earl DYCUS
v.
STATE of Mississippi.
No. 51781.
Supreme Court of Mississippi.
March 25, 1981.
*24 Ronald Reid Welch and Mary Carroll Henkel, Jackson, for appellant.
Bill Allain, Atty. Gen., by Karen Gilfoy, Asst. Atty. Gen., Jackson, for appellee.
Before PATTERSON, C.J., and BROOM and LEE, JJ.
BROOM, Justice, for the Court:
Murder conviction and life imprisonment sentence resulted from Earl Dycus's (defendant's) trial in the Circuit Court of Yazoo County sitting in Warren County following a change of venue. Most serious legal proposition argued here by the defendant is his contention that his handwritten inculpatory statement was erroneously admitted into evidence under the rationale of Dunaway v. New York, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979). Trial was upon a capital murder indictment charging the defendant with the capital murder of Rhonda McBride. After the guilt phase of the trial was completed, the trial judge imposed the life sentence without proceeding to a punishment phase of the trial. We reverse.
When driving around in Yazoo County at about 8:45 a.m. on Saturday, April 23, 1977, David Kirk observed smoke coming from the LeRoy McBride house. Kirk pulled in front of the McBride driveway where he met the defendant (in another vehicle) backing away from the house. Kirk testified that the defendant told him "he had just got there and the house was on fire." For some time residents of the house had been LeRoy McBride and his family: his wife, Martha; his 16-month old daughter, Rhonda; his wife's sister, Mary Jackson; and his wife's brother-in-law, defendant Earl Dycus. Upon discovery of the smoke, Kirk, after a brief discussion with the defendant, went to a nearby house and telephoned the Yazoo City Fire Department while the defendant remained at the burning house. Shortly after 9 a.m., Yazoo City firemen and county sheriff's deputies arrived at the scene and were told by the defendant that he thought someone might be in the house because he could hear "hollerin." Defendant Dycus then used one of the deputies' car radio to notify family members of the fire.
After the fire was under control, Fire Department Captain Stewart discovered two bodies in the front room of the house where the fire's hot spot was centered. Rhonda's body was in the closet; the body of her mother, Martha, was under some bed springs. Fire Chief Woodward investigated the cause of the fire and testified that he found neither combustible material such as gas or kerosene nor electrical outlets in the area where the fire originated. His conclusion was that the fire began in some clothing or parts of debris.
*25 Shortly after the child's (Rhonda's) father, LeRoy McBride, and grandmother, Mrs. George McBride, arrived, the defendant took them back to the George McBride home in Yazoo City before the fire was brought under control. After the defendant took his in-laws into Yazoo City, Sheriff Hood arrived at the fire. He caused a coroner's jury to be assembled at the fire scene where the bodies were identified as Martha and Rhonda. When the sheriff learned that the defendant had been present at the fire scene, he ordered Deputy Woods to pick up the defendant. Defendant Dycus was picked up at the McBride home and taken to the sheriff's office for questioning, and it is conceded that he was under arrest as a matter of fact  without a warrant. Sheriff Hood testified that Deputy Woods gave the defendant his Miranda rights when he picked him up and again at the sheriff's office. Deputy Jennings testified that in the sheriff's office he had heard Woods read the defendant his Miranda rights. Sheriff Hood arrived back at his office around mid-morning and questioned the defendant about his recent release from Parchman Penitentiary. After this brief conversation, Sheriff Hood contacted Yazoo County Prosecutor Norquist and requested permission to take the defendant to the funeral home to identify the bodies of Martha and Rhonda. The finding of the circuit judge at trial was that the defendant was taken to the funeral home for a dual purpose: "to confirm who they were and to persuade him to come clean...." Following his conversation with the county prosecutor, Sheriff Hood handcuffed the defendant and took him to view the bodies. There, according to the record, defendant Dycus made an oral confession followed by his written confession and a tape recorded confession a short time later in the sheriff's office. The indictment before us charged Dycus with the murder of Rhonda while engaged in the commission of arson without intent to effect her death.
Dr. Forrest Bratley, a pathologist, performed an autopsy on Rhonda's body. He testified that her death was due to carbon monoxide poisoning and lack of oxygen due to burning in the room.
As a result of pre-trial suppression hearings, the circuit judge disallowed both the oral and tape recorded statements. He admitted into evidence the defendant's handwritten inculpatory statement (sandwiched in between the other two) which the record establishes was made one to two hours after the oral statement. Except for the defendant's statement, there is no testimony of incendiary origin of the fire.

WAS THE WRITTEN STATEMENT INADMISSIBLE AS AN EXPLOITATION OF AN ILLEGAL ARREST FOLLOWED BY ILLEGAL DETENTION AND CUSTODIAL INTERROGATION IN CONTRAVENTION OF DEFENDANT'S RIGHTS UNDER THE FOURTH AMENDMENT OF THE UNITED STATES CONSTITUTION? (Dunaway v. New York, supra).
Clearly established by the record is the fact that the defendant was taken into custody at the McBride home when no evidence indicated (to the law officers) his participation in the fire or that he was connected with it. At oral argument the state took the position that the sheriff had a right to arrest Dycus because the sheriff knew Dycus had not completed a previous penitentiary sentence (it was apparently unknown to the sheriff that Dycus had been legally given an early release). The record shows that the first officer to contact Dycus after the fire was discovered was Deputy Sheriff Stanley who stated that he asked Dycus no questions when he came in contact with Dycus at the scene of the fire. It was an hour or more after Dycus was picked up that anyone discussed with him or questioned him about his being out of the penitentiary. The argument of the state is that the defendant spontaneously admitted to the officers at the funeral home that he "did it" and would admit what they wanted to know. He then made the written statement after being advised of his rights and signing a written waiver. Dycus's version is that he had gone to the house from his employment to obtain some clothes and found the house burning. He testified that *26 after being taken to the funeral home, his head was pushed by the officers against the genital area of Martha (his sister-in-law) and told to kiss her as he had done before. He further testified that the officers threatened to make him stay there and watch tests (autopsy, etc.) to be performed upon the bodies of the two dead females until he confessed, all of which he says made him sick and coerced him into giving the statement. The state contends that the trial judge correctly determined that the statement admitted into evidence was voluntary after hearing all the officers testify as to what occurred when the writing was made. Agee v. State, 185 So.2d 671 (Miss. 1966).
We cannot accept the state's contention that the defendant failed to press for a ruling as to the inadmissibility of the handwritten statement and therefore waived his objection. To have "pressed" any harder could hardly have been done in prudence. On March 17, 1978, defendant filed a motion to suppress challenging the admission of all written and oral statements as violating the Fourth and Fourteenth (U.S. Constitution) Amendments, i.e., fruits of an illegal arrest made without probable cause. During the proceedings on the motion, the appellant objected to the introduction into evidence of the three statements for lack of probable cause and therefore fruit of a poisonous tree. On April 14, 1978, the circuit judge rendered his order suppressing the oral and taped statements. The written statement, however, was found to be voluntary and therefore admissible. Again, during the trial, defense attorneys objected to the introduction into evidence of the handwritten statement. The trial judge sustained the objection at that time because of the absence of proof of corpus delicti. Defendant (when the issue arose again) renewed his objection based upon an "illegal arrest from which the taint had not been removed ..." but the court nevertheless overruled the objection and admitted the statement into evidence. On at least four different occasions, the defendant objected to the admission into evidence of the handwritten statement. At the suppression hearing the court stated that since the jury was not present, the statement could be let in despite the fact that it might later be suppressed.
In arriving at our decision here, we must be made mindful of the context of the case which includes the aspect that the trial court disallowed both the oral admission of guilt and the tape recorded statement. No cross-appeal was taken by the state from the trial court's action in disallowing these two items of evidence. Before us for our determination is the query: Was there probable cause for the seizure and detention of the defendant? We must also decide whether under Dunaway, supra, there were intervening events which severed any connection of the written confession accepted into evidence with the taint of circumstances surrounding the first disallowed confession.
In Dunaway, supra, a recent case, the proprietor of a pizza parlor was killed in an attempted robbery and an informant gave the police information which implicated Dunaway in the crime. At the time of Dycus's arrest he had not made any admission as to his connection with any crime, and the arresting officer did not have information implicating him in any manner. In Dunaway, the officers checked out the "lead" but learned nothing that would be the probable cause basis of obtaining a warrant for arrest of the accused. There Detective Fantigrossi ordered other officers to "pick up" the accused and "bring him in." Dunaway, 442 U.S. at 203, 99 S.Ct. at 2251, 60 L.Ed.2d at 829. Without telling Dunaway he was under arrest, he was taken to police headquarters and questioned after being advised of his rights. In that situation, Dunaway made incriminating revelations against himself which were admitted into evidence at his trial. Following his conviction and state court appeals, the United States Supreme Court, Dunaway, supra,, held that Fourth Amendment rights "cannot be compromised..." on the basis that an accused's detention under a multifactor balancing test of "unreasonable police conduct under the circumstances." *27 Dunaway, 442 U.S. at 213, 99 S.Ct. at 2256-57, 60 L.Ed.2d at 836. The High Court held that seizures "are `reasonable' only if supported by probable cause." Dunaway, 442 U.S. at 213, 99 S.Ct. at 2256, 60 L.Ed.2d at 837. There as in the instant case, when the accused was seized, no more evidence than "common rumor or report, suspicion, or even strong reason to suspect" connected him with the crime. Dunaway, 442 U.S. at 213, 99 S.Ct. at 2257, 60 L.Ed.2d at 836. Upon such state of the record, under Dunaway, we are bound to hold that the warrantless arrest of Dycus was without probable cause, and not in the nature of the stop-and-frisk detention dealt with in Terry v. Ohio, 392 U.S. 1, 88 S.Ct. at 1868, 20 L.Ed.2d 889 (1968).
In determining the effect of or causal connection between an illegal seizure or arrest and a subsequent inculpatory statement, the facts of each case are to be determinative and no single factor is dispositive. As held in Brown v. Illinois, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975):
The temporal proximity of the arrest and confession, the presence of intervening circumstances ... and, particularly, the purpose and flagrancy of the official misconduct are all relevant.
(422 U.S. at 603-04, 95 S.Ct. at 2261-62, 45 L.Ed.2d at 427).
We held in Jones v. State, 330 So.2d 597, 600 (Miss. 1976), in excluding an accused's statement given after an illegal arrest, that "the Miranda warning in and of itself" did not guarantee that the statement was not obtained by the exploitation of illegal detention. In Dunaway, supra, the U.S. Supreme Court clearly held that detention for custodial interrogation  regardless of its label  triggers the safeguards against illegal arrest within the purview of the Fourth Amendment, supra. As stated by Justice Inzer in State v. Smith, 278 So.2d 411, 415 (Miss. 1973) in commenting on the law as announced by the U.S. Supreme Court: "In such cases it matters not whether we agree with such decisions, we must follow the law announced... ."
In the instant case, the seizing of the defendant followed by taking him from the sheriff's office to the funeral home and back to the sheriff's office for interrogation was without probable cause. No significant event or combination of events transpired thereafter to sever the connection or stream of closely related events between his illegal detention and written statement. It is true that while detained he was allowed to telephone his employer who later came to the sheriff's office. This cannot sever the connection especially in view of the fact that one of the officers present told Dycus he would have to hurry and hang up the phone. Two of the incriminating statements made by Dycus were ruled inadmissible; the statement allowed into evidence over defense counsel's objection came within two hours after the first statement. In Brown, supra, the time interval was four hours, or double that present here. As held in Jones, supra, and Brown, supra, the mere fact that the Miranda warning was given does not of itself erase the effect of the illegal detention. Accordingly, the conviction cannot be allowed to stand. Our decision is not contrary to Smith v. State, 386 So.2d 1117 (Miss. 1980). In Smith, there were entirely different facts upon which we held the accused was arrested with probable cause. There arrestee Smith was found in a high crime back alley shortly after midnight; police had heard breaking glass; Smith ran and while running threw away something held in his hand.
Argument that the state was guilty of racial discriminatory practices in selecting grand jurors, grand jury foreman, and in the striking of certain petit jurors is unsupported by evidence under the cited cases. These two aspects of the case on the record as made do not merit discussion.
As we understand it, the record reveals that defendant's wife, Elizabeth Dycus, on the day of the fire went to the sheriff's office to make inquiry about what happened, not knowing her husband was there. After she inquired about the fire, the sheriff allowed her to visit the defendant; Sheriff Hood exited the room (leaving the door open) and remained just a few feet *28 away in the adjoining room with Lucy Davis who came with Mrs. Dycus to make inquiry. Both Sheriff Hood and Davis heard the defendant tell his wife in substance that "if you had been there, you would have been lying right beside her." Outside the presence of the jury Mrs. Dycus testified that the defendant made such a statement; in the jury's presence, however, all her testimony that the jury heard was, "Well, if you had been there ."
The defendant argues that what Elizabeth Dycus heard her husband say, that quoted in the preceding paragraph, is inadmissible because of the marital privilege.
The distinction between the marital communication privilege and spousal incompetency is often confused and blurred. Succinctly stated, competency to testify for or against the other spouse, absent any statutory guideline, depends upon the status of the parties, i.e., whether they are married or divorced at the time of the trial. The marital communication privilege, however, is unaffected by the status of the parties at the time of the trial and forever prohibits the disclosure of confidential information. Hesdorffer v. Hiller, 111 Miss. 16, 71 So. 166 (1916). Purpose of the privilege is to assure the husband and wife that their confidence and trust will not be misplaced.[1] Two statutory exceptions limiting the competency and privileged communication prohibition have been enacted into law by our legislature. In certain matters, the husband-wife privilege is not "grounds for the exclusion of confidential communications between husband and wife." Mississippi Code Annotated § 43-19-43 (Supp. 1979). Legislative enactments not only allow but may compel one spouse to testify against the other. Mississippi Code Annotated § 13-1-5 (Supp. 1979) reads:
§ 13-1-5. Competency of husband and wife.
Husbands and wives may be introduced by each other as witnesses in all cases, civil or criminal, and shall be competent witnesses in their own behalf, as against each other, in all controversies between them. Either spouse is a competent witness and may be compelled to testify against the other in any criminal prosecution of either husband or wife for a criminal act against any child, for contributing to the neglect or delinquency of a child, or desertion or nonsupport of children under the age of sixteen (16) years, or abandonment of children. But in all other instances where either of them is a party litigant the other shall not be competent as a witness and shall not be required to answer interrogatories or to make discovery of any matters involved in any such other instances without the consent of both.
This Court in Tapp v. State, 373 So.2d 1029 (Miss. 1979) decided that divorced parties are competent to testify against each other. In Tapp, the defendant's former wife voluntarily testified against him regarding circumstances surrounding the child abuse related death of her son. Although former spouses are not disqualified from testifying against each other as to events during the marriage, they may not reveal marital communications made with the expectancy of privacy.
In the case before us now, however, there is a question as to whether Earl Dycus had any expectation of privacy when he made the statement to his wife in the sheriff's office with the door ajar. Dycus had no possible claim to any expectation of privacy with regard to the statements he made to his wife in the sheriff's outer office before third parties. Since Elizabeth Dycus is now divorced from the defendant, she is competent to testify concerning any oral communication made in the presence of third parties provided he was without any reasonable expectation of privacy.
Additionally, the defense argument is that Davis and Hood should not have been allowed to testify as to what they heard Dycus tell his wife because of the hearsay rule. We note however, that an admission against interest constitutes an exception to the hearsay rule. In Brown v. *29 State, 293 So.2d 425 (Miss. 1974) we held admissible what the defendant said to the mother of the homicide victim. The mother went to the jail and asked the defendant why he killed her daughter  his reply "it was an accident" was held admissible in evidence because it was unrelated to custodial interrogation and not instigated by the law officers. At retrial, if what Davis heard Dycus say on the occasion at the sheriff's office is presented after being properly qualified, it may be admissible for whatever worth the jurors would accord it.
In the event the state elects to re-try the defendant in this cause, adherence must be given to Poole v. State, 246 Miss. 442, 150 So.2d 429 (1963) as to establishing the corpus delicti. Other issues need not be discussed inasmuch as reversal is ordered.
REVERSED AND REMANDED.
PATTERSON, C.J., SMITH, and ROBERTSON, P. JJ., and SUGG, WALKER, LEE and HAWKINS, JJ., concur.
BOWLING, J., takes no part.
NOTES
[1] See 98 A.L.R.3d 1285, 1287-8, Marital Privilege  Effect of Separation.