440 So.2d 246 (1983)
Earl DYCUS
v.
STATE of Mississippi.
No. 53840.
Supreme Court of Mississippi.
August 10, 1983.
Rehearing Denied November 16, 1983.
*248 Mary C. Henkel, Thomas, Price, Alston, Jones & Davis, Jackson, for appellant.
Bill Allain, Atty. Gen., by Marvin L. White, Jr., Sp. Asst. Atty. Gen., Jackson, for appellee.
En Banc.
WALKER, Presiding Justice, for the Court on Part I.
HAWKINS, Justice, for the Court on Part II.
The appellant, Earl Dycus, was indicted in the Circuit Court of Yazoo County, Mississippi, *249 for the capital murder of Rhonda McBride, a child sixteen months of age. A motion for change of venue was sustained and the case was transferred to the Circuit Court of the First Judicial District of Hinds County, Mississippi.[1] Upon conclusion of the guilt-phase of the trial, the jury entered its unanimous verdict whereby Earl Dycus was found guilty of capital murder. Following the sentencing phase, the same jury unanimously found that the aggravating circumstances outweighed the mitigating circumstances and the appellant should suffer the penalty of death. Before this Court, the appellant initially assigns twenty-seven errors as grounds for appeal; however, he has specifically addressed ten errors in his brief. This Court finds those not briefed nor combined with those which are briefed to be waived by appellant.

PART I  GUILT PHASE
On the morning of April 23, 1977, the residents of the Leroy McBride home on Ridge Road in Yazoo County, Mississippi, Leroy McBride, his wife, Martha, daughter, Rhonda, and Martha's sister, Mary Jackson, awoke later than usual. Earl Dycus had been living in the same home but had not been there for the two previous nights. Leroy left the house for his job at Johnson Cooling and Heating. Mary left the house at approximately 8:30 leaving Martha, who was wearing a housecoat, and Rhonda, the sixteen-month-old child, in a room located next to the kitchen.
Shortly before 9:00 a.m., David Kirk, a Yazoo City resident at that time, on his way into town observed smoke coming from the McBride home and could see flames flickering inside. He pulled across the driveway of the McBride home and observed a pickup truck, driven by appellant, as it was at the side of the house with the reverse lights on backing out away from the side of the house. The appellant's truck pulled to within fifteen feet of Kirk and stopped. Appellant got out and went over to Kirk's truck. Kirk reported the fire at approximately 8:56 a.m.
Robert Stewart, presently the assistant chief with the Yazoo City Fire department, and approximately eight firefighters arrived at the scene three to four minutes after receiving Kirk's call. The room on the right front of the house was fully in flames. Kenneth Woodard, Chief of the Fire Department, arrived on the scene at approximately 9:06 a.m. Vernon Stanley, deputy sheriff with the Yazoo County's sheriff's department, arrived shortly thereafter between 9:00 and 9:10 a.m. After the fire was extinguished, the men commenced to search the home for victims.
Stewart located the body of a young child (Rhonda McBride) in the closet of the room on the front right side of the house. Some clothes were lying over the child's body, its feet hanging out from underneath them. Immediately afterwards, Stanley found the naked body of an adult female (Martha McBride, Rhonda's mother) in the same room where the child's body was located. The woman's body was lying face down and was underneath some bedsprings. Upon removing the springs from the body, some cloth material covering a portion of the victim's back was also removed. When the woman's body was rolled over, a blue-twisted towel with hair also twisted in it was found underneath her throat.
Chief Woodard testified that the fire began in the right corner of the front bedroom in the same area where the bed was located. It was his opinion the fire started on or around the bed. At approximately 11:00 a.m., he contacted the State Fire Marshall's office and requested that John Chamblee aid in the investigation of the fire.
Chamblee arrived at the scene shortly before noon on the same day. Following *250 his investigation Chamblee determined the fire was not caused by gas nor was it an electrical fire. He further discounted the fact that it could have been originated with a lighted cigarette. In his testimony he stated, "The only other cause it could be, when we have no forms of energy at a particular location, is it had to be set or it had to have been started by someone or somebody in some manner."
Dr. Forest G. Bratley, testifying as an expert in the field of pathology, performed autopsies on both Rhonda and Martha. In determining the cause of death, blood samples were sent to the state crime lab for evaluation. Dr. Hume who at the time was a toxicologist and director of the Mississippi Crime Lab performed the laboratory tests on the blood samples sent by Dr. Bratley. (Motion was entered to prohibit Dr. Hume from testifying. Motion was overruled). The child's blood ran sixty-eight percent carboxyl hemoglobin saturation level, forty percent being considered a possible lethal level. Martha's carboxyl hemoglobin saturation was twenty-two percent, indicating a slow rate of breathing. With the results from Dr. Hume and his examination, Bratley's opinion as to Rhonda's cause of death was that it was brought about by asphyxiation. Martha died of a lack of oxygen and a combination of primarily fire with the addition of asphyxiation from the carbon monoxide. She burned to death. The difference in the carbon monoxide levels between Rhonda and Martha was that:
(1) Martha may have had some depression of her respiratory tract or respiratory center in her brain, she was not breathing deeply and regularly; and
(2) She died from the burns before she could have absorbed a large amount of carbon monoxide. Mr. Meredith Bass, (Motion to exclude his testimony was overruled) a serologist, with the Mississippi State Crime Lab conducted a seriological examination of a cotton swab of a vaginal secretion taken from Martha's body. The results indicated there was a high amount of acid phosphatase and microscopic testing showed intact spermatoza indicating there had been some sexual relations with the victim.
The day of the fire appellant was arrested and taken to the sheriff's office in Yazoo County. Elizabeth Dycus, Martha's sister, who was separated from appellant and in the process of obtaining a divorce from him, went to the sheriff's office for the purpose of talking with him to "find out some answers to some questions I had." The sheriff directed her to a back room and told her she could find out anything she wanted to know there. The appellant was located in that room. This room was one of two small offices which were connected by a door. The door was open and any conversation between appellant and Elizabeth could have been overheard by those in the outer office. At the time, approximately five to seven people were in the outer office. Elizabeth asked appellant, "What did he do that to Martha and Rhonda for" and he responded, "Because you wouldn't come back to me." As both were leaving the room and going into the outer office she asked appellant "What if the kids and I would have been there," to which to responded, "Well, you would have been laying right beside them."
Jimmy Dale Voyles (objection to his testifying was overruled) while a prisoner in the maximum security unit at the Parchman Penitentiary became acquainted with the appellant. During their conversations, Voyles asked the appellant what he was in for. The appellant advised him he had to go back to court. Voyles then asked what he had to go back to court for and appellant responded, "He had raped a lady and strangled her, tied a baby up in a blanket, put it in a closet and set the bed linen afire." They discussed the case on two or three different occasions, each time appellant related the same information. Appellant also informed Voyles "... they couldn't convict him. That they weren't smart enough to catch him." At the time Voyles was a hall man, for which he was given certain privileges, such as being allowed to visit his family without being behind bars, in an open area. Voyles was under the supervision of Lt. Vanlandingham and although he often reported other inmates' conversations *251 to his supervisor when necessary to keep trouble down in the unit, he did not relay the conversations he had with the appellant. He did inform a Mr. Gusack, an investigator with the district attorney's office of Dycus comments, when Gusack came to Parchman in August of 1978 to interview Voyles regarding any conversations he may have had with the appellant.
The appellant did not testify nor offer any witnesses in his behalf during the guilt phase of the trial.
After deliberating for one-half hour, the jury rendered its verdict: "We, the Jury, find the Defendant, Earl Dycus, guilty of capital murder."

A.
The appellant contends that the corpus delicti of arson was not shown aliunde the extra judicial admissions, declarations, or confessions.
This Court adheres to the rule that in a case of arson the fact that a building or property has burned is insufficient in and of itself to prove the corpus delicti of the crime. There must be proof of criminal agency in causing the burning. See Rayborn v. State, 115 Miss. 730, 76 So. 639 (1917); Barron v. State, 111 Miss. 231, 71 So. 374 (1916).
The rule in this regard announced in Poole v. State, 246 Miss. 442, 150 So.2d 429 (1963) is as follows:
The definition of corpus delicti literally is "body or substance of the crime," meaning that a crime has actually been committed, having as a compound fact (1) the existence of a certain act or result forming the basis of the criminal charge, and (2) the existence of criminal agency as the cause of this act or result. The identity of the accused is not an element of the corpus delicti. Every element, criminal charge, and criminal agency must be proved beyond a reasonable doubt; extra judicial admissions, declarations or confessions of accused are not of themselves sufficient to establish the corpus delicti. In cases where there is evidence and also a confession, the rule is as follows: "In order for the corpus delicti to be established by evidence aliunde the confessions, it is not necessary that the proof aliunde should show the crime or corpus delicti beyond a reasonable doubt, but it is sufficient to show it by a preponderance of the evidence or by evidence amounting to a probability, and that the confessions will be received, and, if the confessions coupled with the proof of the corpus delicti aliunde show the corpus delicti beyond a reasonable doubt, it is sufficient." Since corpus delicti in the trial of a criminal case is one of the main elements in the state making out a prima facie case, it is best to see the application to each case whether of common law or statutory charge. Pitts v. State, 43 Miss. 472; Spears v. State, 46 So. 166, 92 Miss. 613; Sam v. State, 33 Miss. 347; Stringfellow v. State, 26 Miss. 157; Brown v. State, 32 Miss. 433; Pope v. State, 131 So. 264, 158 Miss. 794. See McElroy's Mississippi Evidence, sec. 22, Corpus Delicti; Underhill's Criminal Evidence, sec. 403, Proof of Corpus Delicti. (246 Miss. at 446-47).
The Court further went on to state in Poole:
Where accused confesses, corroborative proof will be held sufficient which satisfies the mind that it is real and not an imaginary crime for which accused has confessed. A jury may find that the defendant is the guilty party on proof much less than ordinarily essential. (246 Miss. at 447, 150 So.2d 429).
In such cases as stated above all that is necessary aliunde the confession is a sufficient showing of a probability that a real crime has been committed and not an imaginary one, and a confession may be used to prove this fact beyond a reasonable doubt by direct or circumstantial evidence and the accused criminal agency can be established by the confession alone. Allen v. State, 230 Miss. 740, 93 So.2d 844; Jones v. State, 228 Miss. 458, 88 So.2d 91; Barnes v. State, 199 Miss. 86, *252 23 So.2d 405. (246 Miss. at 447-48, 150 So.2d 429).
In the case now before us, the following was proved:
(1) David Kirk, who reported the fire, and as he drove up to the house, observed Dycus in a pickup truck located at the side of the house with the reverse lights on backing out away from the side of the burning house.
(2) John Chamblee, deputy fire marshal with the State Fire Marshal's office, eliminated gas, electricity or an act of God as the cause of the fire of the McBride home. He eliminated any theory of fire arising from an electrical short as the wiring connecting the wall receptacles at the place of origin of the fire and in the other rooms had no sign of beading or the wires welding together indicative of an electrical short. He further found no indication of an electrical short at the switchbox. Eliminating those forms of energy as a cause of fire, he testified the only other cause it could have been would to have been set or started by someone or somebody in some manner. During cross-examination he agreed with counsel he could not exclude electrical fire originating with an electrical cord as he did not know whether or not one was in the house. He did not, however, find an electrical cord.
(3) The appellant's theory that the fire could have been caused by a smouldering cigarette was so improbable the jury had a right to exclude it. According to the deputy fire marshal, a cigarette would have had to smoulder for 1 to 1 1/2 hours forming a minor amount of smoke, a situation which could have been smelled or observed by anyone in the house, before building up enough heat to burst into flames. Further, the lack of tension found in the bedsprings was indicative of the mattress having burned rather than smouldered.
Mary Jackson, Leroy McBride, Rhonda McBride and Martha McBride were up and about the morning of the fire. Mary Jackson did not smell smoke before leaving the house at approximately 8:30 a.m. The fire was reported at approximately 8:56 a.m.
(4) The level of carbon monoxide in Rhonda's blood was sixty-eight percent while that of Martha McBride was twenty-two percent indicating the mother had a slower breathing rate. The autopsy showed Martha had a depressed trachea. Other testimony established that a twisted towel was under her throat. Rhonda's death was caused by asphyxiation.
In the early case of Perkins v. State, 160 Miss. 720, 135 So. 357 (1931), the appellant was convicted of murder and sentenced to be hung. The remains of the victim were found in his home which was destroyed by fire. On appeal, the appellant raised, among other issues, the insufficiency of the evidence to sustain a guilty verdict as there was no evidence of the corpus delicti aliunde his confession. In addressing this issue, we stated:
The corpus delicti here is: (1) The death of Harbin, (2) caused by a criminal agency. Pitts v. State, supra. Both of these elements may be proven by circumstances.
That the body of a human being was consumed by the fire which destroyed Harbin's residence, and that the body was Harbin's, is hardly open to doubt. The death of Harbin being proven, whether it was caused by a criminal agency "becomes a proper subject of presumptive reasoning upon all the facts and circumstances of the case." Pitts v. State, supra.
A criminal agency as the cause of the burning of the house could not be inferred from the mere fact that the house was burned. Barron v. State, 111 Miss. 231, 71 So. 374; Rayborn v. State, 115 Miss. 730, 76 So. 639. But when we add to the burning of the house the facts that the body of a human being, who was alive and in good health a few hours before, was consumed therein, that no reason appears for suspecting suicide or inability on the part of a normal human being who might be in the house at the time to become aware of the fire and escape before death overtook him, the inference that the human being whose body was burned in the house was killed by another, *253 and the house burned to conceal the crime, while not excluding all doubt thereof, permits the mind to rest with sufficient confidence thereon to be satisfied that it is a real and not an imaginary crime which this appellant has confessed. (160 Miss. at 730-31, 135 So. 357).
In the case sub judice, as in Perkins, we recognize that criminal agency could not be inferred as the cause of the burning of the house from the mere fact that the house was burned. But, when we add to the burning of the house the facts that the bodies of two human beings, who were alive and in good health less than two hours before the fire was discovered, were consumed therein; that there was no apparent inability on the part of Rhonda's mother, a grown human being, to become aware of the fire and escape with the child before death overtook them; that the deputy fire marshal eliminated every reasonable theory as to the fire except that it had been started by somebody; that the level of carbon monoxide in Rhonda's blood was sixty-eight percent while that of Martha McBride was twenty-two percent indicating the mother had a slower breathing rate, together with the testimony of the doctor who performed an autopsy that Martha had a depressed trachea, and other testimony establishing that a twisted towel was found under Martha's throat, leaving an inference of foul play, while not excluding all doubt thereof, certainly permits the mind to rest with sufficient confidence thereon to be satisfied that a real and not an imaginary crime had been committed and that the fire was set to assure the perpetrator of the crime that the person or persons therein were killed and any evidence therein pointing to him was destroyed. Such proof amounts to much more than a preponderance and rises much higher than a probability that a real crime had been committed so as to satisfy the requirements of Poole with respect to proof of the corpus delicti aliunde the confession.
Therefore, we hold that the corpus delicti was sufficiently proved aliunde the extra judicial admission, declarations and confession as to arson and capital murder.

B.
The cumulative impact of the State's failures to comply with pretrial court orders deprived Mr. Dycus of a fair trial in violation of rights under the State and Federal Constitutions.
The appellant contends that in the course of the three days of trial, during which defense counsel Kelley was involved as lead counsel in all aspects of the trial, five previously unannounced witnesses, two of them experts, and a box of evidence came to light.
We will discuss each of the witnesses as well as the box of evidence separately.
(1) M.A. Bass was a serologist who formerly worked with the State Crime Lab. The name of the witness, M.A. Bass, was mentioned to defense counsel during voir dire of the jury. At that time, the State offered to join the defendant in requesting a continuance of the case, but the defendant resisted any further delay in trying the case. Further, the trial court offered to assist defense counsel in securing an expert serologist as an aid to defense counsel, which offer was refused. The record is also clear that the court made it known to defense counsel that he could have a recess of the trial for as long as was necessary in order to prepare himself for cross-examination of M.A. Bass. He was also given an opportunity to and did interview Mr. Bass.
Under these circumstances, the court did everything reasonably possible to accommodate defense counsel and appellant may not now complain. The refusal of appellant to avail himself of the opportunity for a continuance when advised that this witness would testify, prior to the beginning of any testimony, and his refusal to accept the aid of the court in securing an expert amounted to a waiver of any error.
(2) Robert Stewart. The appellant was informed that Robert Stewart was going to testify with reference to certain pictures on the day before the trial began, and appellant was given an opportunity by the court *254 to confer with the witness. In declining the court's offer, counsel for appellant stated, "It won't be necessary if these are the same photographs that were introduced at the last trial." Appellant was assured they were the same and with this assurance, appellant's counsel stated: "I don't need an opportunity to interview him."
We find no error with regard to this witness.
(3) Dr. Arthur Hume. Dr. Arthur Hume ran tests on blood samples of Rhonda and her mother. Defense counsel interposed the same objections to Dr. Hume testifying as were interposed prior to the testimony of M.A. Bass. For the same reasons as stated with reference to M.A. Bass above, we are of the opinion that the court did not err in allowing Dr. Hume to testify.
(4) Box of Evidence. A box of evidence located in the evidence vault of the Yazoo County sheriff's office was discovered and brought to the court the day prior to trial. It contained debris removed from the McBride home after the fire but which had not been brought to the attention of the district attorney until the day prior to the present trial.
Defense counsel was given an opportunity to examine the box of evidence, and, in fact during trial did examine it along with an "arson expert" from Mississippi State University. Appellant did not at trial and has not now shown that the box of evidence contained any favorable matter of benefit to the defendant. Moreover, the appellant was made aware of the box of evidence during voir dire examination of the jury prior to the taking of testimony and was offered a continuance by the State to allow him an opportunity to examine the box, which offer was refused. Any error in regard to the box of evidence was waived by the defendant and he may not now complain. Therefore, the assignment of error in this regard is without merit.
We have also carefully considered this assignment of error on the appellant's theory that the cumulative impact of the failure of the State to timely produce the names of witnesses and the box of evidence deprived the appellant of a fair trial. We are of the opinion that the appellant was not taken by any undue surprise, was not denied any exculpatory evidence, was not denied meaningful cross-examination of witnesses, and consequently was not denied a fair trial.

C.
The appellant next contends that an improper comment by the district attorney during the guilt phase of the trial with respect to defense counsel's cross-examination of a State witness deprived him of a fair trial.
During Mr. Kelley's examination of witness Voyles, Mr. Kelley asked Voyles, "And they check into the county and, if there's any objections by the sheriff or the D.A., you can't make parole," inferring that the witness Voyles would be given special treatment for his testimony. An objection to the question by the district attorney Peters was sustained. Mr. Peters then stated, "And Mr. Kelley knows better than that." The appellant contends that defense counsel was placed in a bad light with the jurors by this statement and was denied a fair trial.
We have carefully considered this assignment of error and find it to be wholly without merit.

D.
The appellant next contends that the court erred in admitting purported expert opinion testimony as to the ultimate fact in issue on the ground that it invaded the province of the jury.
With regard to this assignment of error the court allowed Deputy Fire Marshall John Chamblee to testify, after eliminating all usual sources of fire "that fire then had to have been started by someone or somebody."
The appellant mistakenly bases this assignment on the erroneous premise that Mr. Chamblee's answer was the ultimate fact in issue. The ultimate fact in issue, in this case, was whether or not Earl Dycus started *255 the fire. Furthermore, the answer given by the deputy fire marshall does not eliminate the possibility that the fire could have been started by a member of the McBride household or someone else.
Dycus admitted to Jimmy Voyles that he had in fact set the house on fire after raping Rhonda's mother, Martha McBride, and wrapping Rhonda in a blanket and placing her in a closet. We, therefore, find no merit to appellant's contention in this regard.

E.
The appellant contends that the testimony of Jimmy Dale Voyles to Mr. Dycus' alleged oral confession was erroneously admitted and Voyles' testimony tending to show the accused's conviction of extraneous offenses was reversible error.
In this regard, the record shows that Jimmy Dale Voyles was an inmate of death row at Parchman from 1977 to 1980 and for a part of that time he was a "hall man." His duties were to keep the hall clean, carry the prisoners' food and hot water for baths, etc. As a hall man he was allowed to see visitors while he was not behind bars. He testified that he had not been told by the camp superintendent, Lieutenant Vanlandingham, to pass on information to him; but, that he did tell the Lieutenant things that would "keep somebody from getting killed or something like that." He acknowledged that Vanlandingham expected him to tell him about any of the things which were important that might lead to some trouble in the cell block. Voyles did not report his conversation with Dycus to Lieutenant Vanlandingham or any other official until an investigator from the district attorney's office went to Parchman to interview persons who might have had a conversation with Dycus concerning this crime.
There is nothing in this record to suggest that Voyles was paid any sum or that he received any special privileges for furnishing information to authorities nor is there any suggestion in the record that Voyles was placed in his position as hall man for the purpose of obtaining incriminating information from Dycus or other prisoners. In fact, his testimony is to the contrary. The facts in this case make it distinguishable from the case of United States v. Henry, 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980) cited by the appellant.
In Mansell v. State, 403 So.2d 871 (Miss. 1981), this Court held that the fact that one is a trusty or floor walker does not make him an agent of the authorities for purposes of a Miranda violation. Based upon the same reasoning as in Mansell, we are of the opinion that simply because a convict has special privileges that does not necessarily make him an agent of the State. Voyles was not a paid informant as in Henry, nor was he acting at the direction of the law enforcement officers at Parchman. Therefore, we are of the opinion that the voluntary confession made by Dycus to Voyles was admissible.
The appellant also argues that Voyles' testimony relating that Dycus was in Parchman Penitentiary when the conversation between him and Voyles took place tended to show commission of other offenses not admissible in the trial of this cause. However, under the circumstances presented in this situation, it was necessary to establish the setting and the relationship between Dycus and Voyles before reaching the actual exchange of conversation between the two men. The only reasonable inference to be had from the conversation with Dycus as related by Voyles in his testimony is that Dycus was being held at the penitentiary for the crime for which he is now being tried. The facts of this case make it readily distinguishable from Tucker v. State, 403 So.2d 1274 (Miss. 1981); Loeffler v. State, 396 So.2d 18 (Miss. 1981); Massey v. State, 393 So.2d 472 (Miss. 1981); Gray v. State, 351 So.2d 1342 (Miss. 1977); and Sims v. State, 313 So.2d 27 (Miss. 1975).
Furthermore, when an objection to testimony is interposed and the objection is overruled and the objecting party cross-examines the witness with reference to this same matter to which he had interposed an objection, the objection is waived. See *256 Fielder v. State, 235 Miss. 44, 108 So.2d 590 (1959). The appellant waived any objection that he might have had to the witness' testimony which placed him at Parchman Penitentiary when he brought out the same information in as great or greater detail by his cross-examination.

F.
The appellant next contends that the testimony of Elizabeth Dycus was erroneously admitted.
The appellant contends that any information gained by Mrs. Dycus was inadmissible alleging that she was acting as a listening post for the sheriff while Mr. Dycus was being illegally detained, thus, any information obtained by her was as illegal as if the sheriff himself secured it.
The record does not bear out appellant's contention that the sheriff deliberately directed Mrs. Dycus to question appellant in hopes of eliciting further information as appellant suggests. Mrs. Dycus went unsolicited to the sheriff's office to speak with him to have some questions answered. He advised her to come on back to a small office and that she could find out all she needed to know. He took her back to the office and told her to have a seat and that he would return in a few minutes. The appellant was located in the room with Mrs. Dycus. After speaking with appellant she did not relay any of the information to the sheriff at that time. It was some time after this meeting occurred that Mrs. Dycus reported the conversation to someone at the sheriff's office. The cases appellant cite in support of this premise would apply had the statements been made to a law enforcement officer while appellant was illegally detained. They have no applicability to a voluntary conversation between a husband and his estranged wife. The conversation was not the "fruit of the illegal arrest." There is no proof that Mrs. Dycus was acting as an agent for the sheriff's office. In Brown v. State, 293 So.2d 425 (Miss. 1974), we found statements made by appellant while in jail to the victim's mother were admissible into evidence and not derived from a custodial interrogation since the appellant made the statements freely and voluntarily and also the conversation was not instigated by anyone connected with any law enforcement agency. The appellant in this matter voluntarily made the comments testified to by Mrs. Dycus and the conversation was not instigated by any law enforcement officer.
With regard to appellant's contention as to whether he had any reasonable expectation of privacy while he spoke with Mrs. Dycus, the record is clear he did not. When he told her, in answer to a question, that he had committed the alleged crime because she would not come back to him, he was seated near the door which was open and led into an outer office occupied by five to seven people who were approximately two to three feet away. The other statement inferring she and the children would be lying next to the victims was made when he and Mrs. Dycus were entering into the outer office occupied by third parties. Under these circumstances, no expectation of privacy could have been reasonably expected by appellant.

G.
The appellant next contends that the State's instruction No. 1 defining capital murder was erroneously given under the facts of this case. The appellant argues that the statute, guidance given the jury through instructions, and State judicial interpretation must assure that consistent, objective standards are applied to avoid arbitrary and capricious imposition of the death penalty, citing Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972); Gregg v. Georgia, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 849 (1976); Woodson v. North Carolina, 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976).
Instruction No. 1 is attached hereto as Appendix "A", and in our opinion, does exactly what the appellant contends that it does not do. The instruction requires that the arson must be found first, then that the death of Rhonda McBride must have occurred *257 during the course of the arson. We do not agree with appellant that the evidence produced at trial established a case where the alleged arson was incidental to the murder. The facts as presented by the prosecution proved that Rhonda, who was left in a closet of the McBride home, died as a result of the fire of that home. Furthermore, the State presented sufficient evidence to show the fire was the result of Dycus' intentionally starting it.
In furtherance of his argument, appellant asserts the capital murder statute was unconstitutionally applied not only due to the evidence produced by the prosecution but also because the State declined to amend the indictment whereby he was charged with "causation of death without design." The statute provides that under certain circumstances outlined by the statute, such as arson, Mississippi Code Annotated section 97-3-19(2)(e) (Supp. 1982) that the killing shall constitute capital murder whether done "with or without design" to effect the death of the person killed. A person who intentionally sets fire to a building with or without knowledge that it is occupied would properly be charged with capital murder if indeed that fire resulted in the death of one of the occupants of that building.
Therefore, this assignment of error is without merit. See Washington v. State, 361 So.2d 61 (Miss. 1978) and Gray v. Lucas, 677 F.2d 1086 (5th Cir., 1982).
For the above reasons, the verdict finding Dycus guilty and the judgment of guilt entered accordingly is affirmed.
AS TO THE GUILT PHASE  AFFIRMED.
PATTERSON, C.J., BROOM, P.J., and ROY NOBLE LEE, BOWLING, HAWKINS, PRATHER and ROBERTSON, JJ., concur.
DAN M. LEE, J., takes no part.

PART II  SENTENCING PHASE.
HAWKINS, Justice, for the Court:
On the morning of August 16, 1978, following the guilt phase of his first trial, the jury returned a verdict of guilty of capital murder.
Defense counsel then made a motion to sentence Dycus to life imprisonment, citing Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978). Dycus joined in this motion in his own behalf.
Following a brief recess in which he reviewed the authorities, the circuit judge sustained the motion and sentenced Dycus to life imprisonment. The trial jury then convened and dismissed.
The state then objected to the court's sentence, and the record shows the case concluded. The circuit judge on that day also signed an order, the adjudicating part reading as follows:
IT IS THEREFORE ORDERED AND ADJUDGED that the Defendant, Earl Dycus, for such his crime of Capital Murder to which he has been found Guilty as Charged by a Jury Verdict, be and hereby is sentenced to serve a term of Life without parole, consecutive to cause no. 5888, in the Circuit Court of Yazoo County, Mississippi.
Other events transpired following this order. The state continued its objection to the sentence of life imprisonment, the circuit judge on August 19, 1978 attempted to rescind the previous order and give the state an opportunity for a trial on the sentencing phase on this case. The state declined this offer by the circuit judge, who then reinstated the previous sentence to life imprisonment.
The state served notice it intended to appeal from the circuit judge's order, but none was ever perfected.
Our first opinion states:
After the guilt phase of the trial was completed, the trial judge imposed the life sentence without proceeding to a punishment phase of the trial.
Dycus v. State, 396 So.2d 23, 24 (Miss. 1981).
No issue of the propriety of the circuit judge's ruling and order sentencing Dycus *258 to life imprisonment was raised on the first appeal.
We reversed and remanded the case for a new trial, and upon remand defense counsel moved the circuit judge to prohibit the death penalty issue from being tried, which was overruled. Following a verdict of guilty of capital murder on the second trial, a sentencing phase was conducted and Dycus was sentenced to death.
When the circuit judge on August 16, 1978, in open court sustained the defense motion and sentenced Dycus to life imprisonment, the question of maximum punishment was thereupon irrevocably settled. The circuit judge thereby made a judicial determination that the maximum punishment which could be meted out to Dycus was life imprisonment. It was tantamount to a directed verdict on this issue. See State v. Thornhill, 251 Miss. 718, 171 So.2d 308 (1965). While not necessary to this opinion, our conclusion is reinforced by the failure of the state to perfect an appeal.
In view of our holding, it will not be necessary to address other assignments of error on the sentencing phase of the trial.
AFFIRMED ON GUILT PHASE.
PATTERSON, C.J., BROOM, P.J., and ROY NOBLE LEE, BOWLING, HAWKINS, PRATHER and ROBERTSON, JJ., concur.
DAN M. LEE, J., takes no part.
REVERSED ON SENTENCE PHASE AND DEFENDANT SENTENCED TO LIFE IMPRISONMENT.
BROOM, P.J., and ROY NOBLE LEE, PRATHER and ROBERTSON, JJ., concur.
DAN M. LEE, J., takes no part.
WALKER, P.J., PATTERSON, C.J., and BOWLING, J., dissent.
BROOM, P.J., and ROY NOBLE LEE, PRATHER and ROBERTSON, JJ., specially concur as to Part II.
PATTERSON, C.J., WALKER, P.J., and BOWLING, J., dissent.

APPENDIX "A"
The Court instructs the Jury that in order for you to convict the Defendant of the crime of Capital Murder you must find, beyond a reasonable doubt, from the evidence in this case, beyond a reasonable doubt, that on the 23rd day of April, 1977, Earl Dycus in Yazoo County, Mississippi, wilfully, maliciously, unlawfully and feloniously did set fire to or burn or cause to be burned any dwelling house, whether occupied, unoccupied, or vacant, whether the property of himself or another.
If the Jury first so finds, then it must, also, next find that on said date, while engaged in the commission of the aforesaid arson of said dwelling, if any, that the Defendant, Earl Dycus, unlawfully and feloniously, with or without malice aforethough, (sic) without authority of law, by any means or by any manner, with or without the premeditated and deliberate design to effect the death of Rhonda McBride, not in necessary self-defense, did then and there kill the said Rhonda McBride, a human being.
In the event that the Jury finds both of the above, beyond a reasonable doubt, from the evidence in this case, then and in that event the Defendant is guilty of Capital Murder, and the form of your verdict should be in the following form, written on a separate sheet of paper.
"We, the Jury, find the Defendant, Earl Dycus, guilty of Capital Murder."
ROY NOBLE LEE, Justice, specially concurring:
I concur in Part II of the majority opinion for the reasons set out hereinafter.
The 1978 trial of Dycus, at its inception, began as a case involving the death penalty. On voir dire examination, members of the jury were thoroughly questioned about their conscientious scruples and beliefs on the death penalty. When the jury was impaneled, it was selected to determine the guilt phase and the sentencing phase.
*259 Upon return of a verdict finding Dycus guilty of capital murder, the case then could have proceeded with that jury into the sentencing phase. However, at such point, Dycus made a motion that the death penalty not be imposed, which motion was tantamount to a motion for directed verdict as to the penalty of death. The trial judge sustained the motion and sentenced appellant to life imprisonment in the penitentiary. When the trial judge followed that course of action, whether right or wrong, it became the judicial finding and judgment of the court that the evidence did not justify the death penalty, and, like it or not, we are bound by it.
This Court faced a similar problem in the recent case of Williams v. State, 427 So.2d 100 (Miss. 1983). There, Williams was indicted for the capital offense of raping a female child under the age of twelve years. Conviction carries a sentence of death or imprisonment for life in the state penitentiary. Upon return of a guilty verdict, the trial judge immediately sentenced Williams to life imprisonment. He appealed from that sentence, contending that the court should have sentenced him to a term of years reasonably less than life.[1]
This Court held that the trial judge acted properly in imposing the life sentence and that the order was valid; and that the trial judge was not required to hold a bifurcated trial submitting the question of sentence to the jury. The Court also stated:
The following are instances where the trial judge, whether erroneously or correctly, may rule against the death penalty in a capital case:
(1) Grant a motion for directed verdict or request for peremptory instruction of not guilty (either phase).
(2) Sustain a motion for judgment notwithstanding the verdict (either phase).
(3) Sustain a motion for new trial.
(4) Grant a mistrial after selection of the jury without having a lawful ground therefor. [427 So.2d at 106].
If the trial judge here had granted a directed verdict of not guilty at the conclusion of the guilt phase, although guilt may have been without question and beyond a reasonable doubt, the judgment would have been valid and binding on all courts and would constitute former jeopardy as to any other trial on that charge. See Price v. Georgia, 398 U.S. 323, 90 S.Ct. 1757, 26 L.Ed.2d 300 (1970) and Green v. United States, 355 U.S. 184, 78 S.Ct. 221, 2 L.Ed.2d 199 (1957).[2]
In Jones v. State, 398 So.2d 1312 (Miss. 1981), the trial court granted the state's motion for a mistrial after the jury had been impaneled, and, on retrial of the case, the court held that the prohibition against double jeopardy had attached and immunized the defendant Jones from further prosecution for aggravated assault. See citations in Jones.
In summary, I agree that the crime for which Dycus was convicted is atrocious and heinous. However, I think that the action of the trial judge in sustaining a motion for directed verdict as to the death penalty, entering that solemn judgment on the minutes of the court, and sentencing Dycus to life imprisonment, is a binding and valid order, and I think that, after the jury was discharged and court adjourned, the double jeopardy prohibition attached and gave Dycus immunity from imposition of the death penalty.
Therefore, I concur with Part II of the majority opinion.
BROOM, P.J., and ROBERTSON and PRATHER, JJ., join in this opinion.
ROBERTSON, Justice, specially concurring:
Though much has been said why Dycus' death sentence should here be vacated and *260 made a life sentence, not quite enough has been said.
I agree fully with Part II of the majority opinion authored by Justice Hawkins. I likewise concur in what has been written by Justice Roy Noble Lee, specially concurring.
I write to emphasize my understanding that our vacation of the death sentence is based solely in state law. Nothing in the opinion of Justice Hawkins or that of Justice Lee is to the contrary, even impliedly. The point is just not stated quite as unequivocally as I think it ought be.
Primarily, the basis for our decision is the double jeopardy clause of the state's constitution.[1] Miss. Const. § 22 (1890). Beyond that, the final and unappealed judgment of the Circuit Court back in 1978 to the effect that, as a matter of law, the evidence was insufficient to warrant infliction of the penalty of death, constitutes the law of the case.
PRATHER, J., joins this opinion.
WALKER, Presiding Justice, dissenting as to Part II:
I respectfully dissent from the holding of the majority in Part II wherein they set aside, reversed, and vacated the finding of the jury that Dycus should suffer the death penalty. If there were ever a case in which the death penalty was more deserved than the facts demonstrate in this one, I do not recall it.
After being befriended by the McBride family and given a place to live, the record reveals that Dycus, who had been released from the penitentiary wherein he was serving a term of ten years for the rape of a young woman, raped his benefactor, Mrs. McBride, and then set fire to and burned the McBride home with Mrs. McBride and her sixteen-month-old child therein to destroy any evidence of his crime of rape. The child, Rhonda McBride, for whose death Dycus was tried in this case, and Mrs. McBride burned to death in the resulting fire.
The jury returned a verdict of guilty of capital murder and recommended that Dycus suffer the penalty of death. The trial judge properly sentenced Dycus to suffer death in the means provided by law. I would affirm that judgment and sentence.
The majority has reversed Dycus' sentence of death on the theory that after the jury, in the first trial of this case which was reversed,[1] returned its verdict of "Guilty of Capital Murder" and the trial judge sentenced him to serve life in the penitentiary, even though the issue of whether Dycus would suffer the death sentence or a life sentence was not submitted to the jury as required by Mississippi Code Annotated section 99-19-101 (Supp. 1982), that he may not now be sentenced to the more severe punishment of death.
In my opinion, the majority has erroneously applied the law. It is my view that the trial court did not have the authority, once the jury returned a verdict of guilty of a capital offense, to sentence appellant to life imprisonment without submitting the matter to a jury. Section 99-19-101(1) makes it clear that upon conviction of a capital offense, either by a jury or plea of guilty, the sentencing proceeding shall be conducted before a jury, impaneled for that purpose to determine whether the defendant should be sentenced to death or life imprisonment.
In my opinion any penalty imposed by the trial court, whether it be a life sentence or death sentence, without impaneling a jury to determine which punishment should be imposed is void and of no effect so long as the conviction of the capital murder stands. The state nor the defendant has the authority to waive submitting the issue of sentencing to the jury.[2] This does not mean, *261 however, that after a defendant has been indicted for a capital offense that he may not plead to a lesser included offense, if permitted by the court on recommendation of the state, and receive a sentence appropriate to the lesser crime.
In my opinion, the sentence of the trial court, after the conclusion of the guilt phase of his first trial at which Dycus was found guilty of capital murder, was void without the court first setting aside the jury verdict of "Guilty of Capital Murder" notwithstanding the finding of the jury; and, that after the case was reversed for error committed during the guilt phase of that trial, that the trial court at the conclusion of the second trial properly submitted the question of whether Dycus would be sentenced to life imprisonment or suffer the penalty of death.
It is clear from the August 16, 1978 order of the circuit judge sentencing Dycus to life in the state penitentiary that the verdict of the jury finding Dycus guilty of capital murder was not set aside. That order reads as follows:
IT IS THEREFORE ORDERED AND ADJUDGED that the Defendant, Earl Dycus, for such his crime of Capital Murder to which he has been found Guilty as Charged by a Jury Verdict, be and hereby is sentenced to serve a term of Life without parole, consecutive to cause no. 5888, in the Circuit Court of Yazoo County, Mississippi. (Emphasis added).
I would affirm the judgment of the circuit court sentencing Dycus to suffer the penalty of death as provided by law.
PATTERSON, C.J., and BOWLING, J., join this dissent.
NOTES
[1] This is the second appeal of this case to this Court. The first trial was presided over by then Circuit Judge Dan M. Lee. The conviction of capital murder and life sentence imposed were reversed. (396 So.2d 23 (Miss. 1981)).

This appeal is from a conviction of capital murder and death sentence imposed upon retrial presided over by Circuit Judge William F. Coleman.
[1] He misconstrued the statute, thinking of the section applying to females above the age of 12 years.
[2] Conviction for second degree murder on being reversed placed the defendants in jeopardy as to a second trial on first degree murder.
[1] I note that the federal double jeopardy clause has been similarly construed in Bullington v. Missouri, 451 U.S. 430, 101 S.Ct. 1852, 68 L.Ed.2d 270 (1981). Nothing we say here, however, turns on federal law or on an application of Bullington to this case.
[1] Dycus v. State, 396 So.2d 23 (Miss. 1981).
[2] See Dissent in Williams v. State, 427 So.2d 100, 107 (Miss. 1983).