554 So.2d 887 (1989)
Robert Lee SHELL
v.
STATE of Mississippi.
No. 03-DP-0087.
Supreme Court of Mississippi.
November 29, 1989.
Rehearing Denied December 20, 1989.
*888 Hugh Hathorn, Louisville, Clive A. Stafford Smith, Atlanta, Ga., for appellant.
Mike C. Moore, Atty. Gen., Marvin L. White, Jr., Asst. Atty. Gen., Charlene Robb Pierce, Sp. Asst. Atty. Gen., Jackson, Edwin A. Snyder, Dist. Atty., Eupora, for appellee.
En Banc:
PRATHER, Justice, for the Court:
The appellant, Robert Lee Shell was convicted in the Circuit Court of Winston County for the capital murder of Mrs. Audie Johnson, while in the act of committing armed robbery. Miss. Code Ann. § 97-3-19(2)(e) (Supp. 1989). The jury found that Shell should receive the death penalty, from which sentence he appeals.

STATEMENT OF THE FACTS
During the early morning hours of June 8, 1986, Mrs. Audie Kirkland Johnson, a sixty-eight (68) year old resident of Winston County, was at her home with her step-daughter, Mrs. Evelyn Lenaz. Following the death of her husband approximately two weeks earlier, Mrs. Johnson had family members staying with her. On this early Sunday morning, Mrs. Johnson was brutally attacked and murdered by an unknown assailant, and Mrs. Lenaz was permanently injured.
The assailant struck Mrs. Johnson numerous times across the head with a tire iron, causing massive injuries to her head, comminuted fractures, extensive bruises, subdural hemorrhaging, and heavy bleeding, which caused her death. She suffered a cut above her right eye, and on her right index finger, she received a cut so severe *889 that a portion of the finger was almost severed from the hand.
At approximately 3 p.m. on Monday, June 9, Rev. Burlon Commer, the pastor of the church the Johnsons attended, received a call from Mrs. Lenaz at his home. She told him that she had been attacked. Rev. Commer called the Winston County Sheriff's Office and met a deputy sheriff at the Johnson residence. When the two men went inside the house, they found Mrs. Lenaz in a barely conscious state and also found Mrs. Johnson's body. According to witnesses at trial, Mrs. Johnson was a neat housekeeper, but when Rev. Commer and the deputy sheriff entered the house, they discovered that it was in a state of disarray. Papers were scattered about the house, and in the bedrooms, dresser drawers were emptied. Mrs. Lenaz, survived the encounter, although she was hospitalized for two weeks and remembered none of the events surrounding her attack.
Sheriff Billy Rosamond questioned Robert Lee Shell on June 10, two days after Mrs. Johnson's murder while the Sheriff's department was talking to all the people who lived near the Johnson residence. (Shell lived approximately one mile from Mrs. Johnson). Rosamond stated that Shell initially told him that he and his wife had been to a party that Saturday night and had not seen or noticed anything unusual.
Prior to June 21st, the sheriff talked to Joe Hickman, Robert Shell's father-in-law, at Hickman's house trailer. Shell's house trailer was located behind Hickman's trailer. The sheriff learned from Hickman that, although Shell and his wife had been at a family party on the Saturday night preceding Mrs. Johnson's death, Shell left the party early, and his wife was brought home by another family member. Hickman stated that Shell was not at his home that Saturday night and early Sunday morning until between six and seven a.m. Shell told Hickman that he had run out of gasoline and left his car at a store just north of the Johnson home. Robert Shell and his wife took gasoline to Shell's car and removed it. This information caused the sheriff to ask Hickman to have Shell come to his office.
The Sheriff spoke with Shell again on June 21st, when he voluntarily came in, at which time Shell told him the same story concerning his whereabouts on the evening in question. Then Shell told the sheriff to ask his wife if he didn't believe his story. The sheriff then talked to Shell's wife separately, but Shell's story was not corroborated by his wife; rather, she corroborated her father's story. Rosamond asked Shell and his wife if they would object to a search of their trailer for clothing, to which search they agreed. The Shells signed a waiver form, allowing the Sheriff's department to search the trailer.
While at the trailer, Shell's wife, in the presence of Sheriff Rosamond and Officer Curtis Austin, told her husband to "tell ... the truth" because she had already "told ... the truth." The Sheriff then took Shell back to the Sheriff's office, where Shell was read his constitutional rights under the Miranda decision, (Miranda v. Arizona, 384 U.S. 436, 467-473, 86 S.Ct. 1602, 1624-1627, 16 L.Ed.2d 694, 10 A.L.R.3d 974 (1966)) and signed the waiver of rights form. Following the signing of the form, Shell initially told the same story he had told before. When the Sheriff reminded him what his wife had said to him at the trailer, Shell admitted that he had been out driving the early morning of June 8, and had stopped to pick up two friends, Jimmy Rush and Bubba Hughes. According to this version of Shell's story, Rush and Hughes decided to break into Mrs. Johnson's house. When Shell entered the house, he saw Hughes beating a woman with the tire tool he had used to break into the home. Shell said that he told Hughes to quit beating the woman, and the three men proceeded to ransack the house, eventually netting $287.00 in cash. The men split the money three ways; Shell took the tire tool and threw it behind the house, and went home. The time was approximately 4:30 a.m. on Sunday, June 8, 1989.
Following the giving of this second statement, Shell was officially placed under arrest, and Sheriff Rosamond called Deputy *890 Greg Lee in to assist him. Lee read Shell his rights once again, and asked him if he would be willing to give a statement that would be put in writing. Shell agreed, and Lee took down a statement that was consistent with Shell's prior oral statement to Sheriff Rosamond. Shell told the Sheriff where he had thrown the tire tool, but because it was too dark, they did not look for it that day. Based on Shell's statement implicating Rush and Hughes, warrants were issued for their arrest. When the two men were found, Hughes and Rush were taken to separate jails to keep the men apart until the Sheriff could talk to each of them individually. Rosamond testified at trial that the only evidence linking Rush and Hughes to the crime was Shell's statement.
The next day, June 22nd, Shell accompanied Rosamond and Lee to the Johnson residence to show them where he had thrown the tire tool. Once Shell showed the two men where he thought the tool was, the tool was found. Shell was returned to the Sheriff's office and was read his Miranda rights again prior to questioning by Rosamond and Lee. In this third statement, Shell did not mention Bubba Hughes as an accomplice, and further stated that he wore gloves while inside the Johnson residence and mentioned a pocket knife he had thrown away beside the railroad track. Shell showed the officers where the gloves were located, but the knife was not found until later.
Sheriff Rosamond testified that on the morning of June 23, when he arrived at work, he was told that Shell wanted to see him. When Rosamond talked to Shell, Shell told him that Jimmy Rush was not involved in the attack on Mrs. Johnson or Mrs. Lenaz. The Sheriff called Deputy Greg Lee into his office again, and Shell was read his rights. In the fourth statement Shell gave, he admitted that he had acted alone when he broke into Mrs. Johnson's home, killing her and injuring Mrs. Lenaz. A psychiatric examination was given the defendant which showed that the defendant was criminally responsible at the time of the crimes and was competent to stand trial although he had a history of alcohol and substance abuse.
At trial Sheriff Rosamond testified that Shell was asked to give the sheriff's office the tennis shoes he was wearing, and that he did so voluntarily. Bloodstains were found in several rooms of the house, and traces of blood were found on the tire tool, the gloves, and on the tennis shoes belonging to Robert Lee Shell. No blood was found on a pair of tennis shoes belonging to Jimmy Rush.
Frank McCann, a forensic scientist with the Mississippi Crime Laboratory, testified that the marks found on a piece of paper from inside the Johnson residence were made by the right shoe of Robert Lee Shell. Furthermore, the marks on a business card also found inside the home were made by a right shoe pattern similar to or consistent with, the shoe worn by Shell. McCann also testified that the tests he had run were 100% accurate.
Shell testified at trial, relating a fifth version of the crime. He stated that he had been riding around with Jimmy Rush the night in question. He testified that Bubba Hughes was not with them, but a man named Dexter Ball was. According to Shell's testimony at trial, he, Rush and Ball rode in Shell's car to Noxapater. Rush was at the wheel because Shell was too intoxicated to drive. The group travelled to a party at an unspecified location and then returned to Winston County. According to Shell, his car ran out of gas on the way home, forcing him to leave his car at Flowers' Store.
Continuing Shell's in-court testimony, he stated that as he was walking down the road, he saw three men running from a trailer near the Johnson residence. When the men saw Shell, they yelled at him and began chasing him. Shell was able to outrun the men and hide in the woods. When Shell reached his trailer, he climbed in the bathroom window and went to bed. Shell further testified that when he went to pick up his car the next day, he discovered a gun holster, Army belt, and a pocket knife on the back seat. He also testified that he received two phone calls warning him that *891 he should "take the blame" for what had happened on the night of June 8, "or else they would get to my wife and me." When shown the tennis shoes that the Sheriff's office claimed to have taken from him, Shell stated they were not his shoes.
When questioned about the approximate $300.00 he showed his aunt and uncle the day after Mrs. Johnson's murder, Shell claimed he had won the money gambling the night before. Shell was the only witness put on by the defense. During rebuttal testimony by the State, Greg Lee discredited Shell's testimony. He testified that he had measured the two windows on the back side of Shell's trailer and that they were 55-60 inches from the ground and measured only 12 inches in width. Shell testified on cross-examination that he weighed 170 pounds in June of 1986.
Following the presentation of all evidence by both sides, the jury found Shell guilty of capital murder. Under a separate sentencing hearing in accordance with Miss. Code Ann. § 99-19-101(7) (Supp. 1989) the jury found that the defendant Shell, intended to kill, attempted to kill, and actually killed Audie Kirkland Johnson, and contemplated that lethal force would be used. Additionally, under Miss. Code Ann. § 99-19-101(2) (Supp. 1989), the sentencing jury found as aggravating circumstances that the capital murder was (1) committed when engaged in the commission of robbery and (2) was especially heinous, atrocious, and cruel. Further, the sentencing jury found that "there are insufficient mitigating circumstances to outweigh the aggravating ..." circumstances and imposed the sentence of death. Following sentencing, the case was appealed to this Court.

THE GUILT/INNOCENCE PHASE

I.

DID THE "STATISTICAL ABERRATION" WHICH RESULTED IN NINE MEMBERS OF THE VENIRE WHO HAD HAD A CLOSE RELATIVE MURDERED REQUIRE AMELIORATIVE ACTION BY THE TRIAL COURT?
Under Shell's first assigned error, he claims a "statistical aberration"[1] in the venire from which the jury was drawn prevented him from receiving a fair trial. Mhoon is factually distinguishable from the case at bar, and as a consequence, there is no merit to this assignment of error.
Of the forty-two (42) members of the regular and special venire panels, nine (9) of them had relatives who had been murdered. These relatives included brothers, brothers-in-law, first cousins, fathers-in-law, grandparents and uncles. The State argues on appeal that Shell is barred from assigning this as error because defense counsel failed to object to the composition of the venire and/or jury at trial. Cannaday v. State, 455 So.2d 713, 718-19 (Miss. 1984).[2]
Although not objected to at trial, this assigned error has no merit. Of the nine (9) members of the venire who had had relatives murdered, seven (7) of them did not serve on the jury at all. When voir dire was completed, the defense had two peremptory challenges that had not been used. Therefore, if the defense had objected to the two (2) remaining members of the venire who actually served on the jury and had relatives who had been murdered, none of the original nine would have served. The defense had sufficient peremptory challenges remaining to remove the jurors if they so desired. See Gilliard v. State, 428 So.2d 576, 580 (Miss. 1983); Rush v. State, 278 So.2d 456, 458 (Miss. 1973).
Shell relies heavily on Mhoon, supra, to support his claim that the venire, and consequently the jury, were tainted by the presence of nine (9) venirepersons who had relatives that had been murdered. This Court disagrees, because the facts surrounding Mhoon are distinguishable from those in this case. In Mhoon, twelve (12) of the thirty-nine (39) venirepersons "were either policemen or related by blood or *892 marriage to a current or former police officer ..." Id. at 80. Of this number, six (6) served on the jury, and the jury foreman was a policeman in uniform. Finally, defense counsel in Mhoon exhausted all of his peremptory challenges during jury selection. Id. This Court held that the "statistical aberration", which produced such a venire/jury, mandated a reversal of Mhoon's conviction for a new sentencing hearing. Id. at 81-82. The Court was careful to point out, however, that the mere presence of law enforcement officials in a jury pool was not per se improper, provided the prospective juror was otherwise qualified and was not peremptorily struck by either party. Id. at 81.
In the case sub judice, the trial court questioned each member of the venire about their ability to be impartial, and defense counsel asked each member of the venire if those relationships would prevent them from being "fair and impartial" toward the defendant, Robert Shell. Neither juror Sherrod, whose uncle had been killed, nor juror Goss, whose brother had been killed, indicated they would find it difficult to fulfill their obligations in a fair and impartial manner. Neither juror was peremptorily challenged or challenged for cause.
Cases from other jurisdictions, both federal and state, have held that the presence on a jury of a crime victim, or the relative of a crime victim, is not per se improper.
The fact that a juror or his relative has been the victim of some crime, unrelated to the offense being tried, is, we think, only minimally relevant to the question of that juror's impartiality. Indeed, if the mere fact that a juror or his relative had been the victim of some crime unrelated to that being tried constituted grounds for discharge, it would become difficult, if not impossible, to assemble a jury panel.
U.S. v. Jones, 608 F.2d 1004, 1007 (4th Cir.1979), cert. denied, 444 U.S. 1086, 100 S.Ct. 1046, 62 L.Ed.2d 773 (1980).
In Jones, supra, the Court summarized the issue thusly: "We decline to establish a per se rule of disqualification where a juror is related to a victim of a similar crime." Id. at 1008. See also, Williams v. U.S., 521 A.2d 663, 665 (D.C.App. 1987); Commonwealth v. Johnson, 299 Pa.Super. 172, 445 A.2d 509, 514 (Pa.Super. 1982).
After reviewing Mhoon and case law from various other jurisdictions, this Court concludes that there is no merit to this assignment of error.

II.

DID THE FAILURE TO STRIKE VARIOUS JURORS FOR CAUSE DEPRIVE SHELL OF HIS RIGHT TO A FAIR AND IMPARTIAL JURY?
Under this assignment of error, Shell asserts that the "local knowledge" of the facts of the case made a fair trial impossible. He maintains that too many of the jurors had extensive knowledge of the case and/or built-in biases which created doubt as to their impartiality. After examining both the voir dire of prospective jurors and the actual composition of the jury, this Court concludes there is no merit to this claim.
Once again, the State is correct in noting that no objection was ever made by the defense to the composition of the jury. Cannaday v. State, 455 So.2d 713, 718-19 (Miss. 1984). It is also noteworthy that Shell had initially requested a change of venue. However, before the trial began, he withdrew the motion for a change of venue on his own accord. Shell had the constitutional right to have his trial held in Winston County where the offense was committed. Miss. Const., Art. 3, Sec. 26; State v. Caldwell, 492 So.2d 575 (Miss. 1986).
Shell asserts in his brief that twenty-five (25) of the prospective jurors knew the victim or a member of her family, including her late husband. Shell also maintains that thirteen (13) prospective jurors stated they could not be impartial, for various reasons. The most crucial fact in the case is how many of these alleged "biased" members of the venire became jurors. From this Court's inspection of this record, no member of the jury that convicted Robert Lee *893 Shell had prior knowledge of Mrs. Johnson or her family, and each juror stated unequivocally that they could be impartial. There is no reason to doubt the truth of these responses.
As indicated above, this Court has held on more than one occasion that when a trial court fails to sustain a challenge for cause by the defense, it must be shown that the defense had exhausted all of its peremptory challenges before the trial court's refusal to allow the challenge for cause. Chisolm v. State, 529 So.2d 635, 639 (Miss. 1988); Johnson v. State, 512 So.2d 1246, 1255 (Miss. 1987). Shell failed to use his full allotment of peremptory challenges. When voir dire was completed, he still had two peremptory challenges remaining. For all of these reasons, this Court concludes there is no merit to this assignment of error.

III.

WERE STATEMENTS USED AGAINST SHELL TAKEN IN VIOLATION OF THE SPOUSAL PRIVILEGE?
Shell next contends that on several occasions certain statements allegedly taken in violation of the spousal privilege, were allowed into evidence. Three of these alleged violations of the spousal privilege occurred at the pre-trial hearing and one occurred at trial.
No person has a privilege to refuse to be a witness, or to refuse to disclose any matter or to produce any object or writing, or to prevent another from being a witness, disclosing any matter or producing any object or writing (M.R.E. 501), except for recognized privileges given by the federal or state constitutions or by the rules of evidence. The recognized spousal privilege asserted by Shell here is found in Rule 504, Mississippi Rule of Evidence (M.R.E.), the relevant portions of which read as follows:
RULE 504. HUSBAND-WIFE PRIVILEGE
(a) Definition. A communication is confidential if it is made privately by any person to his or her spouse and is not intended for disclosure to any other person.
(b) General Rule of Privilege. In any proceeding, civil or criminal, a person has a privilege to prevent his spouse, or former spouse, from testifying as to any confidential communication between himself and his spouse.
(c) Who May Claim the Privilege. The privilege may be claimed by either spouse in his or her right or on behalf of the other... .
The spousal privilege has ancient roots[3] and prohibited a wife from testifying against her husband based upon the concept that husband and wife were one entity. Since the woman held no separate legal existence in medieval times, the husband was that entity. Trammel v. United States, 445 U.S. 40, 44, 100 S.Ct. 906, 909, 63 L.Ed.2d 186 (1980). Although the basis for the privilege has long been abandoned, the spousal privilege has continued in some form and is applied to both spouses. The privilege is under criticism today under the view that the spousal privilege contravenes the public's "right to every man's evidence". Trammel, supra, 445 U.S. at 50, 100 S.Ct. at 912.

A. Pretrial Hearing
The first complaint occurred at the pre-trial motion to suppress hearing during Sheriff Rosamond's testimony. He testified that Mrs. Shell "... told me the same thing that her daddy did." He then related the essence of Mrs. Shell's story given outside the defendant's presence denying that Shell had been at home with her Saturday night after the party on June 8. No objection was made at this point to the Sheriff's testimony, and the State asserts, once again, that Shell is procedurally barred from challenging this point on appeal. Because the matter was not presented to the jury, at most, it would infect the integrity of the suppression hearing.
In such a setting, it is appropriate to quote from Cole v. State, 525 So.2d 365 (Miss. 1987).

*894 Counsel may not sit idly by making no protest as objectionable evidence is admitted, and then raise the issue for the first time on appeal. If no contemporaneous objection is made, the error, if any, is waived. This rule's applicability is not diminished in a capital case. Irving v. State, 498 So.2d 305 (Miss. 1986), cert. denied, [481] U.S. [1042], 107 S.Ct. 1986, 95 L.Ed.2d 826 (1987); Johnson v. State, 477 So.2d 196 (Miss. 1985), cert. denied, 476 U.S. 1109, 106 S.Ct. 1958, 90 L.Ed.2d 366 (1986); In re Hill, 460 So.2d 792 (Miss. 1984); Hill v. State, 432 So.2d 427 (Miss. 1983), cert. denied, 464 U.S. 977, 104 S.Ct. 414, 78 L.Ed.2d 352 (1983).
Cole v. State, 525 So.2d at 369; See also, Pinkney v. State, 538 So.2d 329, 338 (Miss. 1988). But see, Cole, supra, 525 So.2d at 384-85 (Robertson, J., concurring).
The next instance of "objectionable" testimony occurred at the pre-trial hearing as well. The Sheriff testified that Shell was not aware of the particulars of his wife's testimony, whereupon Rosamond related her version of the night's events to the appellant. At this point, defense counsel raised an objection to the Sheriff's statements based on spousal privilege. The objection was overruled by the trial court.
Shell's reliance on Bayse v. State, 420 So.2d 1050 (Miss. 1982), is misplaced. In Bayse, a police officer was allowed to "repeat all of the statements made by the defendant's wife to him and outside the defendant's presence." Id. at 1053. That case differs from the case sub judice in that here, three of the four complained-of statements were made at a pre-trial hearing, where the primary issue was the voluntariness of the statements, not the guilt of the appellant. Additionally, Shell encouraged the Sheriff to question his wife, in an effort to corroborate his story.
The defendant asserts that these three instances that occurred at the pretrial stage constitute reversible error. The error asserted is introduction of statements of Shell's wife made to the Sheriff that were subject to the spousal privilege of M.R.E. 504. Rule 504 applies to the spouse testifying as to confidential communication between the spouses and not intended for disclosure to any other person. Initially, this Court notes that these statements of Shell's wife were made to the Sheriff, outside her husband's presence. They were not confidential statements between spouses, and they were not intended to be confidential because Shell invited the Sheriff to talk to his wife. There is no spousal privilege here. If there were any private communications between the Shells that were repeated to the Sheriff by Mrs. Shell, Shell waived any privilege by inviting the Sheriff to talk to his wife. Such a statement was not made under circumstances that suggest it was intended to be confidential.
Additionally, there is equally applicable here the procedural bar for the defense failure to contemporaneously and timely object. This Court holds that no error was committed here for reason of the spousal privilege assertion, and even if so, any error would be harmless. This is so because the evidence received does not call into question the voluntariness finding of the suppression hearing and because the evidence was not presented to the trial jury.

B. At Trial
The next challenged exchange occurred after searching the trailer, when Sheriff Rosamond asked Shell to come down to the Sheriff's office to talk further. As they were leaving, Sheriff Rosamond testified that Mrs. Shell said, "Robert, you tell Mr. Rosamond the truth. I've already told him the truth." Sheriff Rosamond repeated this statement at both the pre-trial hearing and at trial, but defense counsel only timely challenged the statement's admissibility at trial. This objection was overruled by the trial court.
This claim of spousal privilege must also be analyzed under M.R.E. 504. True, the statement was made between the defendant and his wife, but it was made in the presence of the Sheriff and deputy sheriff and was not under circumstances suggesting confidentiality.
The presence of the Sheriff and his deputy when the statement was made is fatal to this portion of Shell's claim.

*895 The privilege protected by Miss. Code Ann. § 13-1-5 extends only to communications which are intended to be confidential. Thus, the presence of another person, even a family member, is deemed to mean that the communication was not intended to be confidential.

Fanning v. State, 497 So.2d 70, 74 (Miss. 1986); Dycus v. State, 440 So.2d 246, 256 (Miss. 1983). This view has been carried forward in Rule 504. See Comment, Rule 504, Mississippi Rules of Evidence;
It is important that this Court note that the Sheriff was asked by the prosecutor "[A]fter you talked to his wife, what happened?" The Sheriff's reply, although unresponsive, was "[s]he told me the same story that he had told me." Record, Vol. III, p. 255. Initially, a reader might wonder to whom the "he" refers. A reading of the trial transcript, however, will reveal that only the defendant's statements were in the record. The content of Shell's now-deceased father-in-law was not mentioned at trial, nor was the content of the spouse's statements.
This Court concludes that there is no error based upon the spousal privilege in this record. The hearsay aspect of this assignment is the subject of an assignment under VI.

IV.

WERE THE SHOES TAKEN FROM SHELL SEIZED IN VIOLATION OF ARTICLE 3, SECTION 23 OF THE MISSISSIPPI CONSTITUTION AND THE FOURTH AMENDMENT OF THE U.S. CONSTITUTION?
Shell claims here that his tennis shoes were taken from him in violation of his constitutional rights under Mississippi Constitution Art. 3, § 23, which provides that "[t]he people shall be secure in their persons, houses, and possessions, from unreasonable seizure or search; and no warrant shall be issued without probable cause, supported by oath or affirmation, specially designating the place to be searched and the person or thing to be seized." U.S. Const. Amend. IV. He advances two theories to support his claim that the shoes were illegally seized: the evidence which supported probable cause for the arrest was illegally obtained; and, even if there was sufficient evidence to establish probable cause, the seizure of the tennis shoes without a warrant was illegal. This Court disagrees.
Before the trial began, defense counsel filed a written motion to suppress various statements made by Shell, allegedly in violation of his constitutional rights. Shell claimed the statements were "obtained in violation of defendant's privilege against self-incrimination and his right to counsel ..." and "... constitute the fruit of an unlawful arrest in violation of defendant's right of privacy ..." At the conclusion of the hearing, the trial court found that the appellant had been given his Miranda warnings, that these rights had been voluntarily, knowingly, and intelligently waived each of the four times he was interviewed, that under all the circumstances and applicable law, the arrest was legal and based on probable cause, and that the statements made by the appellant were voluntarily, knowingly, and intelligently made and were therefore admissible.
The trial court's holding was based on the following findings of fact. During the Sheriff's investigation into Mrs. Johnson's death, he found a discrepancy in the appellant's story. The appellant and his wife voluntarily went to the sheriff's office, at the Sheriff's request. Further discussions with the appellant and his wife led to an increase in the discrepancy. The Shells consented to a search of their trailer, after which the appellant voluntarily returned to the Sheriff's office. Although not in custody, Shell was read his Miranda rights, and he read and signed a written waiver of those rights. He gave a statement following the waiver of his Miranda rights, and as the investigation continued, he was given the Miranda warnings on other occasions. On each of those occasions, he waived his rights and gave statements. The trial court further found that the State had produced each person who could have conceivably been present when any threats *896 were made and also found that no coercion had been used. Agee v. State, 185 So.2d 671 (Miss. 1966). The trial court also addressed the issue of right to counsel, which was raised in the motion but not argued. The trial court found there were no constitutional violations in that area.
This Court has summed up the requirements for probable cause which would support a warrantless arrest in the following manner:
[A] police officer must have (1) reasonable cause to believe a felony has been committed; and (2) reasonable cause to believe that the person proposed to be arrested is the one who committed it.
Floyd v. State, 500 So.2d 989, 991 (Miss. 1986). See also, Lockett v. State, 517 So.2d 1317, 1327 (Miss. 1987); Rule 1.02(3), Miss.Unif.Crim.R.Cir.Ct.Prac.
Along these lines, the Court has also held that:
The existence of "probable cause" or "reasonable grounds" justifying an arrest without a warrant is determined by factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act. The determination depends upon the particular evidence and circumstances of the individual case.
Lockett v. State, 517 So.2d 1317, 1327 (Miss. 1987) (quoting Swanier v. State, 473 So.2d 180, 186 [Miss. 1985]).
To be even more specific, law enforcement officials need not believe "beyond a reasonable doubt" that a crime has been committed, they need only have a "reasonable belief ... a belief rising above mere unfounded suspicion." Alexander v. State, 503 So.2d 235, 238 (Miss. 1987). In this case, the information possessed by the Sheriff's department meets these minimum requirements. Therefore, under the circumstances of this case, there was probable cause for the warrantless arrest.
Under the second half of Shell's argument, he maintains that even if there was sufficient probable cause for the warrantless arrest, "the seizure of his shoes without a warrant was illegal." The basis of Shell's assertion appears to be a lack of "exigent circumstances" which would have justified the warrantless seizure of the tennis shoes. This Court disagrees.
It is a long-standing rule in this, and other jurisdictions that, pursuant to a lawful arrest, law enforcement officials may seize personal effects and clothing from one who has been arrested.
In the instant case the officers took the personal possessions of the defendant after he was arrested. This search is always necessary for many reasons. Among those are: to discover weapons and means of escape; to prevent means of injury to the prisoner and others; to discover necessary medical requirements; to discover evidence in connection with the charge for which accused was arrested; to discover wounds and need for immediate first aid, and to preserve the property of the defendant.
Upshaw v. State, 350 So.2d 1358, 1363-64 (Miss. 1977) (quoting Wright v. State, 236 So.2d 408, 411-12 [Miss. 1970]) (Emphasis added). See also, Wright v. Edwards, 343 F. Supp. 792, 798 (N.D.Miss. 1972); U.S. v. Farrar, 470 F. Supp. 128, 131 (S.D.Miss. 1979).
This point of law has also been addressed by various legal commentators:
Thus, on incident-to-arrest grounds, it has been held that at the station the police may search through the arrestee's pockets, wallet, other containers on the person, and even underclothing, may require the arrestee to strip, and may seize incriminating objects thereby revealed. It is not necessary that there be advance probable cause that such objects will be found.
2 W. LaFave, Search and Seizure, § 5.3(a), at 479-80 (1987). (See also, accompanying footnotes and cases cited therein).
LaFave, supra, cites several cases from other jurisdictions which have specifically addressed the evidentiary value of the arrestee's clothing. See State v. Brierly, 109 Ariz. 310, 509 P.2d 203 (1973) (bloody clothing); Eberhart v. State, 257 Ga. 600, 361 S.E.2d 821 (1987) (defendant required to remove clothing on which police then discovered *897 victim's blood); State v. Freeman, 297 N.W.2d 363 (Iowa 1980) (bloody shoes and trousers); State v. Pettle, 286 So.2d 625 (La. 1973) (t-shirt, pants, underwear); Commonwealth v. Gliniewicz, 398 Mass. 744, 500 N.E.2d 1324 (1986) (boots worn by defendant with tread similar to that of print at crime scene and with blood on them); State v. Smith, 295 Minn. 65, 203 N.W.2d 348 (1972) (boots); Greenfield v. Commonwealth, 214 Va. 710, 204 S.E.2d 414 (1974) (bloody clothing).
In the case at bar, the seizure of Shell's tennis shoes is clearly within the intended scope of the above-cited principles of law. The shoes were removed at the Sheriff's department's request, pursuant to a valid arrest which was based on probable cause. As a consequence, there is no merit to this assignment of error.

V.

DID THE PROSECUTION IMPROPERLY COMMENT ON SHELL'S FAILURE TO COMMUNICATE HIS TESTIMONY TO LAW ENFORCEMENT OFFICIALS PRIOR TO TRIAL, IN VIOLATION OF DOYLE V. OHIO?

On direct examination, Shell testified that on more than one occasion he had tried to tell the Sheriff about seeing three people run out of Mrs. Johnson's house on the evening of June 8. On cross-examination the prosecuting attorney then asked: "Today is the first time you have told any official the version that you've given today?" Shell responded that it was not. He now contends under this assignment of error that the prosecution's question on cross-examination constituted an improper comment on his right to remain silent and to consult with an attorney. He is incorrect in these assertions.
Once again, the State correctly points out in their brief that no objection was made by defense counsel to this question, and therefore, the point is procedurally barred under the authority of Cole and Pinkney, supra. Turning nonetheless to the merits of the claim, Shell's reliance on Doyle v. Ohio, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), and U.S. v. Shavers, 615 F.2d 266 (5th Cir.1980), is misplaced because each of those cases is distinguishable from this one on a factual basis. Doyle addressed an attempt to impeach the defendant with his prior silence and Shavers dealt with the issue of whether the "silence" occurred pre- or post-arrest.
In the case at bar, Shell testified to a version of the events of the morning of June 8 that had never before been given to the Sheriff's office, and in so doing Shell opened himself up to impeachment. The record reflects that Shell did in fact give the Sheriff four other versions of the story. Once he related this new sequence of events on direct examination, the prosecution was well within its rights on cross-examination to inquire further about the novelty of the story. Shell opened this door on direct examination of his own accord, and he should not be allowed to derive an unfair advantage (in effect, penalizing the prosecution) by having done so. There is no merit to this assignment of error.

VI.

DID THE USE OF HEARSAY AND HEARSAY-UPON-HEARSAY IN SECURING SHELL'S CONVICTION DEPRIVE HIM OF DUE PROCESS?
Shell challenges several statements made at trial, from a variety of sources, as hearsay and hearsay-upon-hearsay. M.R.E. 801. Again, no defense objection was made as to any of the evidence.
The first point under this assignment is a subject that has already been addressed under another assignment of error  namely, the statements made by Mrs. Shell to the Sheriff, allegedly in violation of the spousal privilege. The issue here is with reference to its hearsay nature. However, the record shows that the sheriff stated "She told me the same story that he had told me." The record is not clear as to whom "he" refers, whether Mrs. Shell's father or her husband. No contemporaneous objection to hearsay was made. This Court holds that this statement does not constitute reversible error based upon a hearsay objection.
*898 Shell next claims that the Sheriff's testimony concerning his conversations with the appellant's father-in-law constituted hearsay. The appellant makes several references in his brief to the points where the alleged hearsay testimony can be found. The only references by the Sheriff in the record to the appellant's father-in-law concern the location of the father-in-law's residence, the fact that the father-in-law was dead at the time of trial, and the fact that the Sheriff talked to the father-in-law on June 10, 1986, two days after the murder took place. There is no testimony from the Sheriff as to the specifics of his conversation with the father-in-law. Therefore, there is no hearsay present to form a basis-in-fact for this portion of the assignment of error.
Shell next questions the testimony of Rev. Commer, in particular the following statements:
A. And my wife did talk with Evelyn (the victim's stepdaughter), and she said, "This is Evelyn." And my wife knows several Evelyns, and she asked, "Evelyn who?" She said, "Bro. Johnson's daughter." She said, "Someone has tried to kill me."
...
A. No, I didn't know where she was, and I wasn't even sure if it was Evelyn, because it didn't sound hardly human.
The State once again asserts the procedural bar issue, because no objection to the testimony was ever made by defense counsel. Cole and Pinkney, supra. Rev. Commer's testimony was offered to prove something other than the truth of the matter asserted. He was asked the questions, not to prove that someone had killed Mrs. Johnson and attempted to kill Evelyn Lenaz, but to explain the circumstances surrounding his call to the authorities and to explain his presence at Mrs. Johnson's home.
Cases from this Court have upheld the introduction into evidence of other alleged hearsay testimony when their admissibility was challenged on appeal. See Harrison v. State, 534 So.2d 175, 179 (Miss. 1988) (prior statements of witness admissible as circumstantial evidence to show that his trial testimony was unreliable); Alford v. State, 508 So.2d 1039, 1042 (Miss. 1987) (father-in-law's testimony offered not to show that defendant had gun but to show why father-in-law went to get gun); Swindle v. State, 502 So.2d 652, 657-58 (Miss. 1987) (conversation of informant admissible to show why officer acted as he did and was in particular location at a particular time); Graves v. State, 492 So.2d 562, 565 (Miss. 1986) (statement offered not to prove defendant was wearing certain clothing, but that a witness said he was).
Shell's final challenge under this assignment of error concerns the admission into evidence of a copy of Mrs. Johnson's death certificate. He maintains that the introduction of the death certificate without producing witnesses who could be cross-examined about it, constituted hearsay. There is a specific exception to the hearsay rule, under Rule 803 of the Mississippi Rules of Evidence, which addresses this situation:
(9) Records of Vital Statistics.
Records or data compilations of vital statistics, in any form, if the report thereof was made to a public officer pursuant to requirements of law.
A death certificate clearly falls under the language of this hearsay exception. No contention is made that the death certificate was not properly certified or was otherwise defective. There is no merit to this assignment of error.

VII.

DID THE CLOSING ARGUMENTS BY THE PROSECUTION INJECT ARBITRARY ISSUES INTO THE JURY'S DELIBERATION AND THEREBY DEPRIVE SHELL OF A FAIR TRIAL?
Shell maintains that the closing argument presented by the prosecution were improper for three (3) reasons: (1) references to the Bible (2) statements that the appellant lied, and (3) a statement that Robert Shell possessed constitutional rights. This Court is of the opinion that there is no merit to these contentions.
*899 As a preliminary matter, the State once again cites Cole and Pinkney, supra, because no contemporaneous objection was made to any portion of the prosecution's closing argument. Additionally, they cite Johnson v. State, 477 So.2d 196 (Miss. 1985), a capital murder case which addressed the necessity for contemporaneous objections to objectionable closing arguments.
We next observe it is the duty of a trial counsel, if he deems opposing counsel overstepping the wide range of authorized argument, to promptly make objections and insist upon a ruling by the trial court. The trial judge first determines if the objection should be sustained or overruled. If the argument is improper, and the objection is sustained, it is the further duty of trial counsel to move for a mistrial. The circuit judge is in the best position to weigh the consequences of the objectionable argument, and unless serious and irreparable damage has been done, admonish the jury then and there to disregard the improper comment... .
477 So.2d at 209-10 (citations omitted).
During closing argument in the case sub judice, the prosecution made the following statement:
In Genesis, there is a story that we are told about a question asked by God of Cain when [H]e asked him, "Where is your brother?" And Cain archly replied to God, "What? Am I my brother's keeper?" That is the first recorded instance in the whole of the human race where a murder was committed. And as human beings we are today in this Courtroom poor because of the sin of Cain against his brother whose life he took.
We live an age in which human life by many is cheap indeed. And we still hear ringing in our voices the question of God, "Where is your brother?"
In the first instance, while pointing out religious references made by the prosecutor, Shell neglects to mention the numerous references to the Bible made by his own trial counsel. Examples of these religious references are scattered throughout defense counsel's closing argument.
In the second place, such "religious" references are not improper.
Counsel may draw upon literature, history, science, religion, and philosophy for material for his argument. He may navigate all rivers of modern literature or sail the seas of ancient learning; he may explore all the shores of thought and experience; he may, if he will, take the wings of the morning and fly not only to the uttermost parts of the sea but to the uttermost limits of space in search of illustrations, similes, and metaphors to adorn his argument.
Johnson v. State, 416 So.2d 383, 391 (Miss. 1982) (quoting Gray v. State, 351 So.2d 1342, 1346 [Miss. 1977]) (emphasis added). See also, Wilcher v. State, 448 So.2d 927, 942 (Miss. 1984).
Shell next contends that the prosecution improperly called him a liar during closing arguments. There are several references by the prosecution in which they characterize Shell as a liar. However, case law in this State runs directly contra to Shell's position. In Simpson v. State, 497 So.2d 424 (Miss. 1986), the prosecutor made multiple references to the defendant as a liar. Id. at 431. In upholding the appellant's conviction, this Court held the following:
In this case, the comment by the prosecutor was that the defendant was not telling the truth about the events of March 4, 1982. That can hardly be said to be an extraneous issue, since, if the State believed Simpson's story, he would not have been tried. There is no error here.
497 So.2d at 432.
The vast majority of the prosecutor's statements labeling Shell a liar occurred as he was reiterating key portions of the story Shell told on the stand concerning the events of the evening of June 8. Shell had never told that particular version of the night's events prior to trial. Additionally, he had already given three other versions of the story to the Sheriff's department in written statements. Under the circumstances, it is understandable that the prosecutor would feel justified in calling Shell a liar.
*900 Shell himself admitted on the stand that he had lied on more than one occasion about key facts. The prosecutor's comments were in response to evidence and testimony presented in the case, and he was allowed to draw reasonable conclusions from them.
He may comment upon any facts introduced in evidence. He may draw whatever deductions seem to him proper from these facts, so long as he does not use violent and abusive language, and even in many cases invectives may be justified and even called for, as pointed out by Chief Justice Whitfield in Gray v. State, 90 Miss. 235, 43 So. 289.
Johnson v. State, 416 So.2d 383, 391 (Miss. 1982) (quoting Nelms & Blum Co. v. Fink, 159 Miss. 372, 131 So. 817 [1930]).
Finally, Shell challenges the prosecution's comment that he was "clothed in the full protection of the Constitution of the United States and he has got what Audie Johnson never got. And that is a jury of twelve good people to decide his fate." Shell claims that this statement represented a comment on his exercise of specific constitutional rights. This Court has expressed its disapproval of such a practice. Griffin v. State, DP-68 (decided August 10, 1989) (failure to testify and other constitutional rights). Other jurisdictions have expressed similar views. Gunnerud v. State, 611 P.2d 69, 75 (Alaska 1980) (failure to testify); Adams v. State, 263 Ark. 536, 566 S.W.2d 387, 389 (Ark. 1978) (failure to testify); People v. Rodgers, 756 P.2d 980, 984-85 (Colo. 1988) (right to jury trial); Garron v. State, 528 So.2d 353, 357 (Fla. 1988) (use of insanity defense).
Each of these cases condemns attempts by the prosecution to penalize a defendant for the exercise of a constitutional right. The use of these various improper arguments creates an unfair inference of guilt, which is prohibited by the Constitution. In the case sub judice, the comment by the prosecutor appears to have simply been an isolated statement, because no other portion of the closing argument focused on the exercise of constitutional rights by the appellant. Therefore, in the opinion of this Court the comment does not warrant reversal of the jury's verdict. There is no merit to any part of this assignment of error, and it is denied by this Court.

VIII.

WERE THE JURY INSTRUCTIONS AT THE GUILT PHASE FUNDAMENTALLY FLAWED?
Here, Shell finds fault with the jury instructions given at the guilt phase of the trial because they "were very brief, and failed to fully apprise the jurors of the elements of the crime charged."
The State points out again that no objection was made to the jury instructions that are challenged as being deficient. Rule 5.03 of the Uniform Criminal Rules of Circuit Court Practice provides that "[a]t the conclusion of the taking of testimony the attorneys shall dictate into the record their specific objections to the requested instructions and specifically point out the grounds for objection." Notwithstanding the absence of objection to any instruction, this Court considered the instructions and finds no deficiency in the trial court's instructions taken as a whole. Since the jury was properly instructed, there is no merit to either portion of this assignment of error.
Concluding the guilt/innocence phase of the trial, the jury returned a verdict of guilty to capital murder while engaged in the crime of robbery. The murder of Mrs. Audie Kirkland Johnson resulted from the assault upon her by the assailant using a tire tool; the jury found that assailant to be the defendant Robert Shell. The underlying crime of robbery is defined in Miss. Code Ann. § 97-3-79 as a "tak[ing] or attempt to take from the person or from the presence the personal property of another and against his will by violence... ." The State proved the corpus delicti of robbery by establishing the disarranged condition of the victim's house when it was normally kept in a tidy condition. The removal of clothing from drawers, of guns from the gun rack and emptied billfolds was sufficient to evidence an attempted *901 robbery. By statutory definition, the attempt to rob, as well as the robbery, constitutes the crime of robbery. Upon this proof, the confession of the defendant to the taking of money from the victims' purses is admissible. Thus, the corpus delicti of robbery is established. Sullivan v. State, 216 Miss. 809, 63 So.2d 212 (1953).
In addition to the above, this Court has held in a capital murder case that the corpus delicti in a homicide case is made up of two fundamental facts, the first, the death of the deceased, and the second, the fact of the existence of a criminal agency as to the cause of death. In Gentry v. State, 416 So.2d 650 (Miss. 1982), this Court held that the admission of the confession to establish the corpus delicti of the underlying felony of robbery was proper so long as the corpus delicti of murder was sufficiently established. Rhone v. State, 254 So.2d 750 (Miss. 1970); Elliott v. State, 183 So.2d 805 (Miss. 1966). It is this Court's opinion that the evidence presented was sufficient to convince a rational factfinder of Shell's guilt of the crime of capital murder while engaged in the commission of robbery beyond a reasonable doubt.

SENTENCING PHASE

IX.

WAS THE JURY'S SENTENCING DETERMINATION PREDICATED ON THE CONSTANT INTERJECTION OF THE CHARACTER OF THE VICTIM AND HER FAMILY?
Shell claims that the jury's sentence was based at least in part on character traits of the victim, which are not appropriate for the jury to consider during the sentencing phase. Shell bases his claim on the authority of Booth v. Maryland, 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987), in which the U.S. Supreme Court invalidated the use of victim impact statements during sentencing of criminal defendants in capital murder trials. See also, South Carolina v. Gathers, 490 U.S. ___, 109 S.Ct. 2207, 104 L.Ed.2d 876 (1989). The statements at issue in this case addressed Ms. Johnson's housekeeping habits and cannot in any way be characterized as victim impact statements. The proof was offered to support the State's proof of an attempted robbery and as such were admissible.
Initially, it should again be noted that no contemporaneous objection was made to any of this so-called objectionable testimony. The State urges that the point is therefore not preserved for appeal. Lockett v. State, 517 So.2d 1346, 1354 (Miss. 1987); Booker v. State, 511 So.2d 1329, 1331 (Miss. 1987).
Shell also cites Fuselier v. State, 468 So.2d 45 (Miss. 1985), as support for his claim. That case addressed the prejudicial effect of having a member of the victim's family seated near the prosecutor's table, and had nothing to do with victim impact testimony. Therefore, it offers no benefit to Shell.
This testimony in no way resembles the victim impact testimony at issue in Booth, supra. In Booth, family and friends testified about the victim's personal characteristics, the emotional effect of the crimes on the victim's family, and the family's opinions of the crimes and the defendant. A footnote in Booth provides some insight into the difference between that case and this one.
Our disapproval of victim impact statements at the sentencing phase of a capital case does not mean, however, that this type of information will never be relevant in any context. Similar types of information may well be admissible because they relate directly to the circumstances of the crime.
See fn. 16, 482 U.S. at 507, 107 S.Ct. at 2535, 96 L.Ed.2d at 451.
In the opinion of this Court, the testimony at issue here cannot be accurately characterized as victim impact testimony. As a consequence, there is no merit to this assignment of error.

X.

DID THE ADMISSION OF GRUESOME AND HIGHLY PREJUDICIAL PHOTOGRAPHS AT THE PENALTY PHASE, *902 AFTER A DETERMINATION THAT THEY WERE INADMISSIBLE AT THE GUILT PHASE, DEPRIVE SHELL OF HIS RIGHTS UNDER THE CONSTITUTION AND THE RULES OF EVIDENCE?
The focus of this assignment of error is five (5) photographs of Mrs. Johnson's body taken at the autopsy. Four of these pictures reflect the appearance of the body prior to the autopsy and depict the nature of the wounds as first seen by the medical examiner. The fifth photograph shows the top portion of Mrs. Johnson's head with part of the hair shaved off to reveal the extent of the wounds. Shell asserts that these photographs were unnecessarily gruesome and served only to inflame and prejudice the jury.
This Court has recently addressed the admissibility of potentially gruesome photographs:
While acknowledging that generally the admissibility of photographs is within the sound discretion of the trial judge and the admission is proper, so long as their introduction serves some useful evidentiary purpose. [sic] Williams contends that the close-up photographs were not necessary for the jury's understanding of the cause of death nor was the repetitive nature, and the result could only be to inflame and prejudice the jury.
We have repeatedly admitted photographs of every description with the explanation that some "probative value" is present. Johnson v. State, 476 So.2d 1195, 1206 (Miss. 1985); Swanier v. State, 437 [473] So.2d 180, 185 (Miss. 1985); Cabello v. State, 471 So.2d 332, 341 (Miss. 1985); Holliday v. State, 455 So.2d 750, 752 (Miss. 1984); Billiot v. State, 454 So.2d 445, 460 (Miss. 1984). Abuse of discretion is sometimes explained to be admission of photographs when a killing is not contradicted or denied or the corpus delicti and the identity of the deceased have been established. Sharp v. State, 446 So.2d 1008, 1009 (Miss. 1984); Shearer v. State, 423 So.2d 824, 827 (Miss. 1982); Williams v. State, 354 So.2d 266, 267 (Miss. 1978).
Williams v. State, 544 So.2d 782, 785 (Miss. 1987).
This Court, however, did hold that a trial judge abused his discretion in McNeal v. State, 551 So.2d 151 (Miss. 1989), where photographs of the "decomposed, maggot-infested body of the victim" were gruesome and lacked evidentiary purpose. The Johnson photographs are clearly distinguishable from both Williams, supra, and McNeal, supra. The pictures themselves provide graphic proof of the atrocious nature and extent of Mrs. Johnson's injuries, which gave evidentiary value to the aggravating circumstance of acts of an "heinous, atrocious, and cruel" nature.
Shell next questions how the disputed photographs could be inadmissible at the guilt phase, yet be admitted during the sentencing phase. The answer to this question can be found in Jackson v. State, 337 So.2d 1242 (Miss. 1976), where this Court held that a bifurcated trial was necessary in capital murder cases "to overcome problems with respect to the introduction of evidence in a death penalty case, some of which would be relevant to the sentencing decision but would have no relevance to, or may even be prejudicial to the question of guilt." Id. at 1252. This case presents just such a situation, and the trial court properly held the photographs inadmissible during the guilt phase, but admissible for the sentencing phase on the issue of whether the crime was heinous, atrocious, or cruel. The same procedure has been followed in other decisions by this Court. Leatherwood v. State, 539 So.2d 1378, 1383 (Miss. 1989); Booker v. State, 449 So.2d 209, 216-17 (Miss. 1984); Coleman v. State, 378 So.2d 640, 648-49 (Miss. 1979).
Finally, Shell argues that the prosecution failed to make a successful showing of the heinous, atrocious, and cruel requirement in this case, and that they further failed to offer sufficient explanatory evidence when the photographs were introduced. During the sentencing phase of the trial, the prosecution asked the court to allow the re-introduction *903 of the evidence and testimony from the guilt phase into evidence at the sentencing phase. This motion was granted by the trial court. The evidence reintroduced at this point included extensive testimony from Pat Eddings, of the Mississippi Medical Examiner's office, about the severity and scope of Mrs. Johnson's injuries. Robert Shell's own written statement to the Sheriff's department served as further substantiation of the nature of the injuries.
The trial court also gave the jury Instruction S-3, which defined the required elements for the crime at issue.
The Court instructs the jury that in considering whether the capital offense was especially heinous, atrocious, or cruel, heinous means extremely wicked or shockingly evil; atrocious means outrageously wicked and vile; and cruel means designed to inflict a high degree of pain with indifference to, or even enjoyment of the suffering of others.
This jury instruction, combined with the other testimony and evidence presented by the prosecution, adequately defined and proved the "heinous, atrocious or cruel" nature of Mrs. Johnson's death at the hands of Robert Lee Shell. Additionally, there was sufficient explanatory evidence of the photographs when they were introduced. There is no merit to this assignment of error.

XI.

DID THE JURY INSTRUCTIONS AT THE PENALTY PHASE FAIL TO GUIDE THE JURY'S DISCRETION AS REQUIRED BY ARTICLE 3, SECTION 28 OF THE MISSISSIPPI CONSTITUTION AND THE EIGHTH AMENDMENT TO THE UNITED STATES CONSTITUTION?
Article 3, § 28 of the Mississippi Constitution provides that "cruel or unusual punishment shall not be inflicted, nor excessive fines be imposed." U.S. Const. Amend. VIII. Under this assignment of error, Shell lists seven alleged defects in the jury instructions given by the trial court at the penalty phase of the trial. The State urges that Shell is procedurally barred from making this claim due to his failure to make a contemporaneous objection at trial. Cole and Pinkney, supra.

A.
Under the first portion of this assignment of error, Shell claims that the instructions given to the jury were defective because they stated that the jury "may objectively consider the detailed circumstances of the offense for which the defendant was convicted, and the character and record of the defendant." Shell claims that this portion of the court's instruction C-1 was improperly given because the use of the word "may" allows the jury to permissively consider mitigating circumstances, instead of requiring them to do so. The U.S. Supreme Court cases relied on by Shell (Hitchcock, Skipper, and Eddings)[4] are factually distinguishable from the case at bar in that they forbid the placing of limitations on what mitigating factors the jury may consider. Such is not the case here.
The decisions of this Court do not place limitations on what mitigating circumstances the jury may consider.
He may prove his lack of prior criminal record and may introduce such other evidence of his character or the particular circumstances of his crime that would be relevant in deciding whether he should be sentenced to death or life imprisonment.
Jackson v. State, 337 So.2d 1242, 1254 (Miss. 1976). See also, Cole v. State, 525 So.2d 365, 371 (Miss. 1987).
At a later point in Instruction C-1, the jury is told that if they find aggravating circumstances to be present, they then "must consider" whether mitigating circumstances are also present. There is no flaw in this portion of the jury instructions.

*904 B.
Secondly, Shell argues that the jury instructions shifted the burden of proof from the prosecution to the defense. The disputed language appears in Instruction C-1 and reads as follows:
Next, to return the death penalty, you must find that the mitigating circumstances, those which tend to warrant the less severe penalty, life imprisonment  do not outweigh the aggravating circumstances  those which tend to warrant the death penalty.
This same issue was decided by this Court in Jordan v. State, 365 So.2d 1198 (Miss. 1978):
Essentially, Jordan contends that "the guidelines of Jackson appear to require the Defendant to shoulder the burden of proof on mitigating circumstances versus aggravating circumstances." Jackson simply holds, however, that one on trial for the charge involved here must be given an opportunity to present any "circumstances or combination of circumstances surrounding his life and character or the commission of the offense with which he is charged that would be reasonably relevant to the question of whether he should suffer death" or life imprisonment.
365 So.2d at 1206.
In Gray v. Lucas, 677 F.2d 1086 (5th Cir.1982), the Fifth Circuit considered Mississippi's death penalty statute, and concluded the following:
Every mandatory element of proof is assigned to the prosecution. Neither the burden of production nor the burden of proof ever shifts to the defendant.
Id. at 1105-06. See also, Stringer v. State, 500 So.2d 928, 944 (Miss. 1986).
Shell also contends that under the instructions given, death, not life, is presumed to be the proper sentence. This issue was disposed of in Leatherwood v. State, 435 So.2d 645 (Miss. 1983), where this Court held that while one found guilty of capital murder occurring during a robbery becomes subject to the death penalty, this penalty is not automatic.
The appellant's argument that he enters into the sentencing phase of the bifurcated trial with one strike against him is correct in one sense  i.e., if he had not been convicted of a capital offense, there would be no need for the sentencing hearing and he would simply be sentenced to serve a life term. This does not mean though that the procedure is unfair or faulty.
435 So.2d at 650.
Shell's reliance on Jackson v. Dugger, 837 F.2d 1469, 1473 (11th Cir.1988), is improper. In Jackson, the jury was instructed that death was the appropriate penalty. In the case sub judice, there was no such instruction. Therefore, there was no presumption that death was the proper sentence.

C.
Under Shell's third argument, he maintains that the jury should have been instructed that a life sentence should be assumed to be life without parole. There is no indication in the record of such an instruction ever being requested by the defense. This Court has held that such a failure serves as a bar to raising the point on appeal. Stringer v. State, 500 So.2d 928, 937 (Miss. 1986); Lockett v. State, 517 So.2d 1317, 1333 (Miss. 1987).
Additionally, this Court has rejected the merits of this very argument on several occasions. Wilcher v. State, 455 So.2d 727, 737 (Miss. 1984); Johnson v. State, 416 So.2d 383, 391 (Miss. 1982); Bullock v. State, 391 So.2d 601, 610 (Miss. 1981). There is no merit to this claim.

D.
Shell's fourth claim is that it was error to not instruct the jury on the consequences of a failure to agree on punishment. Once again, no such instruction was ever requested. Stringer, supra, at 937; Lockett, supra, at 1333. The same argument on the merits was used by the appellant in Stringer, with no success.
The argument creates an illusion of prejudice, which has no logical basis. If the jurors were unable to unanimously find *905 that the aggravating circumstances were sufficient to impose the death penalty and that there were insufficient mitigating circumstances to outweigh the aggravating circumstances, then they could not return a death sentence. Further, in the event they could not unanimously agree after a reasonable period of deliberation, it would be the trial judge's duty under Miss. Code Ann. § 99-19-103 to dismiss the jury and impose a sentence of life imprisonment on the defendant.
500 So.2d at 945.

E.
Under Shell's fifth argument, he claims that the jury instructions failed to apprise the jury of their prerogative to exercise mercy. Again, no instruction was offered in this regard. Stringer and Lockett, supra. The merits of the issue have also been answered contra to Shell's position. This Court has held on several occasions that there is no right to a mercy instruction. Williams v. State, 544 So.2d 782, 788 (Miss. 1987); Nixon v. State, 533 So.2d 1078, 1100 (Miss. 1987); Cabello v. State, 471 So.2d 332, 348 (Miss. 1985). Therefore, it would not have been error for the trial court to refuse to grant such an instruction, had one been requested.

F.
Shell's sixth claim centers around the adequacy of the instructions given to the jury concerning mitigating circumstances. Although conceding that his argument has long been rejected by this Court, Shell nonetheless maintains that the jury was never sufficiently informed that there need not be a unanimous finding of mitigating circumstances. This claim is without merit.
In Stringer v. Jackson, 862 F.2d 1108 (5th Cir.1988), the Fifth Circuit examined a jury instruction that dealt with mitigating circumstances, and in which the word "unanimous" appeared. The Court held the following:
Although the trial court undoubtedly added "unanimously" by oversight as the third word in the instructions quoted below, a reading of the entire charge would not have led the jurors to think they were compelled to ignore mitigating circumstances (unless found unanimously) in determining an appropriate sentence for Stringer. The instructions given did not restrict the jury's right and power to consider the appropriateness of the death penalty even after it found that the aggravating circumstances outweighed the mitigating circumstances.
862 F.2d at 1112.
In the case at bar, the word "unanimous" or "unanimously" was not a part of the mitigating circumstances portion of the jury instructions. Instruction C-1 refers to a unanimous jury finding for aggravating circumstances, but there is no corresponding requirement for mitigating circumstances.
In addition to the language found in the jury instructions, defense counsel made the following statement during closing arguments:
And if one of you feel like this man's entitled to mercy, when you get back into that room there and deliberate, you can hold out and say, "No, I want him to have some mercy." It takes only one of you to hold out for that mercy if that's what you choose to do. And regardless of who tries to persuade you or dissuade you, if you give up in yourself that he's entitled to mercy, then you hold out, because if you bolt at that point in time and end up convicting him, then you're going to be punished for the rest of your life. Did I do right? If I get that chance would I do that again?

G.
Shell's final contention is that the instruction concerning the "heinous, atrocious, or cruel" aggravating factor failed to meet constitutional standards and that the limiting instruction given by the trial court was also vague. The limiting instruction, S-3, reads as follows:
The court instructs the jury that in considering whether the capital murder was especially heinous, atrocious, or cruel, the word heinous means extremely *906 wicked or shockingly evil; atrocious means outrageously wicked and vile; and cruel means designed to inflict a high degree of pain with indifference to, or even enjoyment of the suffering of others.
Shell relies on Maynard v. Cartwright, 486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988) to support his assertion that the aggravating factor instruction was defective. Maynard is distinguishable from this case for several reasons. The U.S. Supreme Court in Maynard struck down a "heinous, atrocious, or cruel" instruction because there was no accompanying instruction defining those terms.
This Court pointed out in Clemons v. State, 535 So.2d 1354, 1363-64 (Miss. 1988) that "[t]his Court has placed a limiting construction on `especially heinous, atrocious, or cruel.'" This fact was also mentioned in Woodward v. State, 533 So.2d 418, 434 (Miss. 1988). Although Maynard stated the need for a limiting instruction, no mention was made of the specific language needed to satisfy this requirement. 486 U.S. at 365, 108 S.Ct. at 1859-60, 100 L.Ed.2d at 382. This Court held in Pinkney v. State, 538 So.2d 329 (Miss. 1988), that:
[I]t is sufficient for us to hold that hereafter, capital sentencing juries of this State should and must be specifically instructed about the elements which may satisfy the aggravating circumstance of "especially heinous, atrocious, or cruel."
538 So.2d at 357.
No mention is made in Pinkney of the specific language requirements for the limiting instruction. The instructions at issue in this case appear to adequately define each of the three potential aggravating factors in terms the average layman (juror) could understand. The language used is neither vague nor unclear. Shell also questions the disjunctive language of the aggravating factor instruction, claiming that it is impossible to know whether some of the jury found the murder heinous, some atrocious, and some cruel. The cases relied on by Shell address criminal statutes which prohibit a series of distinct acts. In one of those cases, United States v. Balistrieri, 779 F.2d 1191 (7th Cir.1985), the Court stated:
If the jury is told only to determine if the defendant violated the statute, some jurors could find him guilty because he performed one of the prohibited acts, while others might find him guilty because he performed another. The appearance of unanimity would be misleading, because the jury may have reached no agreement as to what the defendant actually did.
779 F.2d at 1224.
The problem being addressed in Balistrieri is not present here. Only one crime  the murder of Mrs. Johnson while in the commission of a robbery  was considered by the jury. The list of aggravating circumstances applies only to this one crime. The issue for the jury to determine was whether the aggravating circumstances as a whole applied to the murder of Mrs. Johnson, a question they answered in the affirmative. Furthermore, the jury found two aggravating circumstances overall, that the murder was committed during the course of a robbery, and that the murder was heinous, atrocious, or cruel. Even should this Court find that the aggravating circumstance challenged here is invalid, the remaining circumstance is sufficient to uphold the death sentence. Clemons, supra, at 1362.
This Court holds that there is no merit to any of the seven portions of this assignment of error, and, as a consequence, to the assignment of error as a whole.

XII

DOES THE AGGREGATION OF ERROR IN THIS CASE REQUIRE THE REVERSAL OF SHELL'S SENTENCE?
Having found no reversible error in this case, this Court holds that there is no aggregation of error so as to justify a reversal of Shell's conviction on this assignment. This Court affirms the guilt and sentencing phases of this trial.

*907 PROPORTIONALITY REVIEW

IS THE SENTENCE OF DEATH DISPROPORTIONATE IN THIS CASE?
Under his final assignment of error, Shell claims that, based on the facts of this case, the death penalty is an inappropriate punishment. Miss. Code Ann. § 99-19-105(3)(c) (1972), as amended, directs this Court to consider in death penalty cases, in addition to the assigned errors, the punishment imposed, as follows:
(3) With regard to the sentence, the Court shall determine:
(a) Whether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor;
(b) Whether the evidence supports the jury's or judge's finding of a statutory aggravating circumstance as enumerated in Section 99-19-101; and
(c) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.
The facts of this case clearly showed that Mrs. Audie Johnson, a sixty-eight (68) year old widow, was brutally attacked and murdered on the morning of June 8, 1986. She died from a series of blows administered by a heavy metal object, which the prosecution maintained was a tire iron. She was repeatedly forcefully struck about the head with the tire iron, shattering numerous bones, creating swelling in her brain, and hemorrhaging. Mrs. Johnson was also severely cut several times during the attack, nearly severing the top half of one of her fingers in the process.
The evidence against Robert Lee Shell was very imposing. He gave a written confession to the Sheriff's office and a bloody shoe print matching the pattern of his tennis shoes was found at the scene. He also showed the Sheriff's office where he had thrown the tire iron, knife and gloves as he left the house. The only witness offered by the defense was Shell himself, and no alibi witnesses were offered.
The psychiatric evaluation revealed that Shell was a twenty-one (21) year old black male of average intelligence. He understood the charges against him, was qualified to assist his attorney during the course of trial, and did not suffer from any impairment of his memory. While there was some history of alcohol and substance abuse, there was no indication of any mental disorder.
Having made a thorough review of this record, this Court holds that as to the above Miss. Code Ann. § 99-19-105(3)(a), the death penalty was not the result of passion, prejudice, or any other arbitrary factor, that as to 3(b), the jury's finding of statutory aggravating circumstances is supported in the record; and that as to 3(c) the sentence of death is proportionate to the penalty imposed in similar cases, considering the defendant and the crime. (See Appendix). The Court, therefore, affirms the penalty of death.
CONVICTION OF CAPITAL MURDER AND SENTENCE OF DEATH AFFIRMED. WEDNESDAY, JANUARY 10, 1990, SET AS DATE FOR EXECUTION OF SENTENCE IN THE MANNER PROVIDED BY LAW.
ROY NOBLE LEE, C.J., HAWKINS and DAN M. LEE, P.JJ., and ROBERTSON, SULLIVAN, ANDERSON, PITTMAN and BLASS, JJ., concur.

APPENDIX

DEATH CASES AFFIRMED BY THIS COURT
Turner v. State (DP-82, decided November 22, 1989).
Davis v. State, 551 So.2d 165 (Miss. 1989).
Pinkney v. State, 538 So.2d 329 (Miss. 1989).
Clemons v. State, 535 So.2d 1354 (Miss. 1988).
Woodward v. State, 533 So.2d 418 (Miss. 1988).
Nixon v. State, 533 So.2d 1078 (Miss. 1987).
Cole v. State, 525 So.2d 365 (Miss. 1987).
*908 Lockett v. State, 517 So.2d 1346 (Miss. 1987).
Lockett v. State, 517 So.2d 1317 (Miss. 1987).
Faraga v. State, 514 So.2d 295 (Miss. 1987).
Jones v. State, 517 So.2d 1295 (Miss. 1987).
Wiley v. State, 484 So.2d 339 (Miss. 1986).
Johnson v. State, 477 So.2d 196 (Miss. 1985).
Gray v. State, 472 So.2d 409 (Miss. 1985).
Cabello v. State, 471 So.2d 332 (Miss. 1985).
Jordan v. State, 464 So.2d 475 (Miss. 1985).
Wilcher v. State, 455 So.2d 727 (Miss. 1984).
Billiot v. State, 454 So.2d 445 (Miss. 1984).
Stringer v. State, 454 So.2d 468 (Miss. 1984).
Dufour v. State, 453 So.2d 337 (Miss. 1984).
Neal v. State, 451 So.2d 743 (Miss. 1984).
Booker v. State, 449 So.2d 209 (Miss. 1984).
Wilcher v. State, 448 So.2d 927 (Miss. 1984).
Caldwell v. State, 443 So.2d 806 (Miss. 1983).
Irving v. State, 441 So.2d 846 (Miss. 1983).
Tokman v. State, 435 So.2d 664 (Miss. 1983).
Leatherwood v. State, 435 So.2d 645 (Miss. 1983).
Hill v. State, 432 So.2d 427 (Miss. 1983).
Pruett v. State, 431 So.2d 1101 (Miss. 1983).
Gilliard v. State, 428 So.2d 576 (Miss. 1983).
Evans v. State, 422 So.2d 737 (Miss. 1982).
King v. State, 421 So.2d 1009 (Miss. 1982).
Wheat v. State, 420 So.2d 229 (Miss. 1982).
Smith v. State, 419 So.2d 563 (Miss. 1982).
Johnson v. State, 416 So.2d 383 (Miss. 1982).
Edwards v. State, 413 So.2d 1007 (Miss. 1982).
Bullock v. State, 391 So.2d 601 (Miss. 1980).
Reddix v. State, 381 So.2d 999 (Miss. 1980).
Jones v. State, 381 So.2d 983 (Miss. 1980).
Culberson v. State, 379 So.2d 499 (Miss. 1979).
Gray v. State, 375 So.2d 994 (Miss. 1979).
Jordan v. State, 365 So.2d 1198 (Miss. 1978).
Voyles v. State, 362 So.2d 1236 (Miss. 1978).
Irving v. State, 361 So.2d 1360 (Miss. 1978).
Washington v. State, 361 So.2d 61 (Miss. 1978).
Bell v. State, 360 So.2d 1206 (Miss. 1978).

DEATH CASES REVERSED AS TO GUILT PHASE AND SENTENCE PHASE
West v. State, 553 So.2d 8 (Miss. 1989).
Griffin v. State (DP-68, decided August 10, 1989).
Leatherwood v. State, 548 So.2d 389 (Miss. 1989).
Mease v. State, 539 So.2d 1324 (Miss. 1989).
Houston v. State, 531 So.2d 598 (Miss. 1988).
West v. State, 519 So.2d 418 (Miss. 1988).
Davis v. State, 512 So.2d 1291 (Miss. 1987).
Williamson v. State, 512 So.2d 868 (Miss. 1987).
Foster v. State, 508 So.2d 1111 (Miss. 1987).
Smith v. State, 499 So.2d 750 (Miss. 1986).
*909 West v. State, 485 So.2d 681 (Miss. 1985).
Fisher v. State, 481 So.2d 203 (Miss. 1985).
Johnson v. State, 476 So.2d 1195 (Miss. 1985).
Fuselier v. State, 468 So.2d 45 (Miss. 1985).
West v. State, 463 So.2d 1048 (Miss. 1985).
Jones v. State, 461 So.2d 686 (Miss. 1984).
Moffett v. State, 456 So.2d 714 (Miss. 1984).
Lanier v. State, 450 So.2d 69 (Miss. 1984).
Laney v. State, 421 So.2d 1216 (Miss. 1982.)

DEATH CASES REVERSED AS TO PUNISHMENT AND REMANDED FOR RESENTENCING TO LIFE IMPRISONMENT
Reddix v. State, 547 So.2d 792 (Miss. 1989).
Wheeler v. State, 536 So.2d 1341 (Miss. 1988).
White v. State, 532 So.2d 1207 (Miss. 1988).
Bullock v. State, 525 So.2d 764 (Miss. 1987).
Edwards v. State, 441 So.2d 84 (Miss. 1983).
Dycus v. State, 440 So.2d 246 (Miss. 1983).
Coleman v. State, 378 So.2d 640 (Miss. 1979).

DEATH CASES REVERSED AS TO PUNISHMENT AND REMANDED FOR A NEW TRIAL ON SENTENCING PHASE ONLY
Johnson v. State, 547 So.2d 59 (Miss. 1989).
Williams v. State, 544 So.2d 782 (Miss. 1989).
Lanier v. State, 533 So.2d 473 (Miss. 1988).
Stringer v. State, 500 So.2d 928 (Miss. 1986).
Pinkton v. State, 481 So.2d 306 (Miss. 1985).
Mhoon v. State, 464 So.2d 77 (Miss. 1985).
Cannaday v. State, 455 So.2d 713 (Miss. 1984).
Wiley v. State, 449 So.2d 756 (Miss. 1984).
Williams v. State, 445 So.2d 798 (Miss. 1984).

DEATH CASES REMANDED
Leatherwood v. State, 539 So.2d 1378 (Miss. 1989).
Abram v. State, 523 So.2d 1018 (Miss. 1988).
NOTES
[1] This phrase is borrowed from Mhoon v. State, 464 So.2d 77, 81 (Miss. 1985).
[2] It should be noted that Shell is represented by different counsel on appeal to this Court.
[3] E. Coke, A Commentarie upon Littleton 6b (1628).
[4] Hitchcock v. Dugger, 481 U.S. 393, 107 S.Ct. 1821, 95 L.Ed.2d 347 (1987); Skipper v. South Carolina, 476 U.S. 1, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986); Eddings v. Oklahoma, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982).