**IN THE SUPREME COURT OF MISSISSIPPI**

**NO. 2002-KA-00450-SCT**

*ODIS EMERY, JR.*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 2/22/2002 |
| TRIAL JUDGE: | HON. RICHARD A. SMITH |
| COURT FROM WHICH APPEALED: | WASHINGTON COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | WILLIAM R. LABARRE |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY:  DEIRDRE McCRORY |
| DISTRICT ATTORNEY: | FRANK CARLTON |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | REVERSED AND REMANDED - 04/01/2004 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**DICKINSON, JUSTICE, FOR THE COURT:**

¶1.     Odis Emery, Jr., was tried before a jury in Washington County, Mississippi, on a charge of burglary of a dwelling house.  During trial, Emery took the stand, but did not testify on direct examination as to his whereabouts at the time the crime was committed.

¶2.     On cross-examination, the prosecutor asked Emery where he was at the time the crime was committed.  Then, over objection, the prosecutor was allowed to cast suspicion on Emery by asking him why he had not told his story before.

¶3. The jury found Emery guilty, and he was sentenced to twenty years in the custody of the Mississippi Department of Corrections.

¶4. Emery appeals and now asserts that the trial court committed reversible error by allowing the prosecutor to impeach him for exercising his constitutional right to remain silent. We agree, and we reverse and remand for a new trial.

## FACTUAL BACKGROUND

¶5. On February 10, 2001, at approximately 9:00 p.m., police officers Taylor, Williams and Maybell responded to a burglar alarm at 823 Simmons Street, in Hollandale, Washington County, Mississippi. There they discovered that someone had either pried or broken open the back door. Upon entering the house, officer Taylor discovered someone in the bathroom and ordered him to step out into the hallway and to place his hands on the wall. When the individual refused to comply, Taylor tried to push him against the wall. Something fell out of the suspect's pocket onto the floor, causing Taylor to look down. When Taylor looked down, the individual then "swirled around." Officer Taylor also turned, but the suspect's hand hit Taylor's wrist causing his gun to discharge.

¶6. The suspect fell to the ground claiming that he had been hit. Taylor used a flashlight to check for a wound, and then stepped back to speak to another officer as to what they needed to do. The suspect then jumped up, dove through the kitchen window and escaped. Five days later, Emery was arrested and charged with burglary of a dwelling house.

¶7. Emery testified at trial, but no questions were asked on direct examination as to his whereabouts at the time the alleged crime was committed.

2

¶8.     On cross-examination by the prosecutor, the following exchange took place between the prosecutor and Emery:

> Q.    All right. ***You say you weren't there that night?***
>
> A.    No, I wasn't.
>
> Q.    And I'm talking about the night of the 10th, February 10th at that house. ***Where were you?***
>
> Q.    Saturday, approximately 10:30 that morning, me and a guy named Jerry Wright, we left and went to Leland to see a woman that raised me when I was coming up, like a big sister. Her name Pearl Young. We went over to her house that day, were taken there by her niece – I mean, her daughter and her son-in-law, d we did barbecue, . . . So the people that brought us to Leland, they left the party, . . . and we didn't see them no more until about 10:30, 11:00 o'clock that night. That was the time they came back and picked us up and brought us back to Hollandale . . . .
>
> Q.    Okay. Today is February 19th. Would you agree with me?

(emphasis added). At this point, the questioning was interrupted by Emery's counsel, William R. Labarre:

> <u>BY MR. LABARRE</u>: Your honor, can we approach the bench?
>
> <u>BY THE COURT</u>: Yes.
>
> <u>BY MR. LABARRE</u>: The State did make a demand for intent to use an alibi defense. We did not offer an alibi. ***He is eliciting this information himself. I know where he is going with it because he has done it to my clients before, that how come you never told anybody anything up to this point***. I would object to that line of questioning. He is not required to make any statement. He is not required to do anything. He has elicited the information about where he was. We did not present it. I think it's improper cross-examination for him to try to badger him about the fact that he has not made any mention of this to anybody else up until this date.
>
> <u>BY MR. GORE</u>: I disagree, Your honor. ***That has always been allowed***. It is a simple question. Why didn't you tell the police this when you – I am going to say this is the first time you are telling this.

3

BY THE COURT: I'm going to allow this.

¶9.     The questioning then resumed, as follows:

A.      Yes.

Q.      Thank you.  Again, back to my question, would you agree with me that day is February 19th?

A.      Yes, I do agree.

Q.      And that this burglary occurred, you were arrested on February 15 of 2001?

A.      Yes.

Q.      ***And this is the first time that you have ever made that statement or told that story, isn't it?***

A.      Upon my arrest, like I said, I was maced down, I was cuffed, forced to take pictures.  I even asked the officer to let me speak to my lawyer before I even make any type of statement or anything. ...

Q.      If you would, simply answer my question.  ***In over a year's time since you've been arrested, this is the first time that you've told that story; isn't that correct?***

A.      Talking about as far as where I was?

Q.      Yes.

A.      No.

Q.      Who did you tell the story to?

A.      My father knew about it, my family knew about it.  If I'm not mistaken, the investigator – I told the investigator about it.

Q.      What investigator?

A.      I think it's my lawyer's investigator, if I'm not mistaken.

4

Q. **But you didn't tell anybody else?**

A. By him being my lawyer, he pretty much is my speaker too. So I forward information to him, and he will take it from there.

Q. *Simple question. You didn't tell anybody else, did you?*

A. No.

¶10.  During closing argument, the prosecutor argued to the jury: **"Okay, there ain't nothing about this going to Leland to a barbecue stuff. Folks right there, you can tattoo 'liar' right across his forehead because that's what he did. He took that stand and he lied to you."**

¶11.  The jury returned a verdict of guilty of burglary of a dwelling house, and Emery received a 20-year sentence.

## DISCUSSION

¶12.  At the time of his arrest, Emery was advised of his constitutional rights ( the "*Miranda* Warning"), which included a statement to Emery that he had the right to remain silent.    In *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed.2d 694 (1966), the United States Supreme Court stated that "[p]rior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Id.* at 444. During the thirty-seven years following that decision, the *Miranda* Warning has probably become more familiar to the general public than any other concept in our criminal law. It would be difficult to find anyone who is not aware that, when you are arrested, "you have the right to remain silent."

5

¶13. The question before us is not whether the police officers who arrested Emery conducted themselves properly in advising Emery of his constitutional right to remain silent. They did. Indeed, after being so advised, Emery exercised his right to remain silent, up until the time of trial. Rather, the question before us is whether the trial court committed reversible error by allowing the prosecutor to imply to the jury that Emery's post-arrest silence was an indication that he was untruthful and, by implication, an indication that he committed the crime. This is not a new or novel question. It was first answered almost thirty years ago.

¶14. In *Doyle v. Ohio*, 426 U.S. 610, 96 S. Ct. 2240, 49 L. Ed.2d 91 (1976), ten years after its *Miranda* decision, the United States Supreme Court examined a case in which the prosecutor attempted to impeach a defendant's exculpatory story, told for the first time at trial, by cross-examining the defendant about his post-arrest silence after receiving the *Miranda* warning. The State argued "necessity" as justification for the prosecutor's action, and further argued that "the discrepancy between an exculpatory story at trial and silence at the time of arrest gives rise to an inference that the story was fabricated somewhere along the way, perhaps to fit within the seams of the State's case as it was developed at pretrial hearings." The State further argued that "the prosecution usually has little else with which to counter such an exculpatory story," and sought "only the right to cross-examine a defendant as to post-arrest silence for the limited purpose of impeachment." *Id.* at 616.

¶15. In rejecting these arguments, the United States Supreme Court stated that:

> while it is true that the Miranda warnings contain no express assurance that silence will carry no penalty, such assurance is implicit to any person who receives the warnings. In such circumstances, *it would be fundamentally unfair and a deprivation of due process* to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial.

6

*Doyle*, 426 U.S. at 619  (emphasis added).

¶16.    The question presented here is not one of first impression in Mississippi.  This Court has clearly set forth in our case law the admonition of *Doyle*.  Such admonitions are sometimes referred to as "black-letter" or "hornbook" law.

¶17.    In *Quick v. State*, 569 So. 2d 1197 (Miss. 1990), the trial court allowed the prosecution  to ask the defendant whether he made certain complaints or explanations to the officer who had arrested him and brought him to the courthouse. *Id.* at 1199.  This Court held that

> an accused person who has been given his *Miranda* warnings is not obliged to answer any questions or to make any explanation. **It is improper and ordinarily, reversible error to comment on the accused's post-*Miranda* silence.**  The accused's right to be silent then is equally as strong as the right not to testify and it is error to comment on either.  Certainly it is improper to inquire of the defendant as to whether he made any protest or explanation to the arresting officers."

*Id.* (emphasis added).

¶18.    Similarly, in *Puckett v. State*, 737 So. 2d 322 (Miss. 1999), this Court pointed out that "[i]n *Doyle* the U.S. Supreme Court held that if an accused under arrest was given a *Miranda* warning and told that he had a right to remain silent, and the accused did remain silent, that the government thereafter could not use his choice of remaining silent as a weapon during his trial testimony cross-examination to cast suspicion on his guilt or innocence.  Simply put, the government cannot use an accused's exercise of a Constitutional right as a weapon to convict him." *Id.* at 350.

7

¶19.  It is lamentable and somewhat disturbing that this clearly enunciated legal principle, with a vintage of over thirty years, escaped both the trial court and the prosecutor.  Had the prosecutor argued, and the trial court accepted, some exception to the rule, we would simply cite *Doyle* and its progeny, and reverse without further comment.  But no exception was argued.

¶20.  We note that there are circumstances under which reversal would not be required, notwithstanding questions by the prosecutor as to the defendant's post-arrest silence.  *See, e.g., Caston v. State*, 823 So. 2d 473 (Miss. 2002) (defendant cannot complain on appeal of alleged errors invited or induced by himself); *McGrone v. State*, 807 So. 2d 1232 (Miss. 2002) (defendant's due process rights not violated by the State's cross-examination concerning his post-arrest silence where *Miranda* warning not given).

¶21.  Also, in *Gossett v. State*, 660 So. 2d 1285 (Miss. 1995), the prosecutor commented on the defendant's post-*Miranda* silence.  However, the defendant was not allowed to respond. This Court held that, even if error had occurred, it was harmless because of the overwhelming evidence of the defendant's guilt.  Additionally, the trial judge gave a cautionary instruction to the jury that "no one has any obligation whatsoever to make a statement to investigating authorities and [they] have a perfect right to decline to make a statement."  The trial judge also instructed the jurors that an individual's silence "shall not be held against them and you shall draw no inferences from that fact."  *Id.* at 1291-92.  We held that "[w]hile this instruction may have mistakenly drawn the jurors' attention to the fact that the defendants may have been silent upon arrest, the jury is presumed to have followed the court's instruction."  *Id.* at 1292.

¶22. The "harmless error" holding in *Gossett* was further explained in ***Riddley v. State***, 777 So. 2d 31 (Miss. 2000). Where, we held that "even errors involving a violation of an accused's constitutional rights may be deemed harmless beyond a reasonable doubt where the weight of the evidence against the accused is overwhelming." *Id.* at 35. There, we found the prosecutor's comments, though improper, not reversible, because of the overwhelming weight of evidence against the accused, including his own admission and testimony that he shot and killed the victim.

¶23. Here, the State understandably does not argue that the weight of the evidence of guilt is overwhelming, beyond a reasonable doubt. In closely examining the record in this case, we note the following:

There were no fingerprints, DNA, or other physical evidence;

There were no pictures taken of the crime scene; and

There was no confession.

¶24. The only evidence presented to the jury which suggested that Emery committed the crime was his failure to tell his story prior to trial, and the eyewitness identification of the police officers. However, the record indicates that the identification by the officers was not completely reliable. Officer Taylor testified that the officers "got together and discussed what [they] had seen and tried to get – put together a good description of the suspect." Officer Jessie Williams, however, testified that they did not discuss what the individual looked like.

¶25.    Furthermore, the only description included in the police report was of the perpetrator's clothing; a white shirt, a black leather jacket, dark pants and a bandanna around his head. Five days after the burglary, Emery was wearing clothing that matched that description.

¶26.    What the State does claim, in attempting to justify the prosecutor's questions which, according to *Doyle*, were "fundamentally unfair and a deprivation of due process," is that the questions were designed to show the "novelty" of Emery's story. The State cites *Shell v. State*, 554 So. 2d 887 (Miss. 1989), *rev'd on other grounds*, 498 U.S.1, 111 S.Ct. 313,112 L. Ed. 2d1 (1990), and *Brown v. State*, 749 So. 2d 82 (Miss. 1999), both of which are inapposite and unpersuasive.

¶27.    In *Shell*, the defendant gave a new version of facts on direct examination rather than, as here, on cross-examination. (The defendant had also previously given four other versions of events to the Sheriff). This Court held that the defendant opened the "door on direct examination of his own accord," and therefore "the prosecution was well within its rights on cross-examination to inquire further about the novelty of the story." *Shell,* 554 So. 2d at 897.

¶28.    In *Brown*, the defendant raised on appeal ineffective assistance of counsel for failing to object to prosecutorial comments made during the sentencing phase. *Brown*, 749 So. 2d at 91. However, here Emery's counsel made a timely objection.

¶29.    It is clear that the trial court committed reversible error, and this case must be reversed and remanded for a new trial. We feel further compelled, however, to emphasize that the controlling authority in this case comes from the United States Supreme Court, and has been well-settled for over a quarter of a century. We would expect that this cross-examination technique employed by the prosecutor, and allowed by the trial court, would cease.

10

## CONCLUSION

¶30.    For these reasons, we reverse the judgment of the Circuit Court of Washington County,

and we remand this case to that court for a new trial consistent with this opinion.

¶31.    **REVERSED AND REMANDED.**

   **SMITH, C.J., WALLER, P.J., EASLEY, CARLSON AND GRAVES, JJ., CONCUR. COBB, P.J., CONCURS IN RESULT ONLY. DIAZ, J., NOT PARTICIPATING.**